Don **BEHARRY**, Petitioner,

v.

Janet **RENO**, as Attorney General of the United States; Doris Meissner, as Commissioner of the Immigration and Naturalization Service; Edward McElroy, District Director, Immigration and Naturalization Service, New York District; and the Immigration and Naturalization Service, Respondents.

No. 98 CV 5381(JBW).

United States District Court, E.D. New York.

Jan. 22, 2002.

Genet Getachew, Brooklyn, NY, for Petitioner Don Beharry.

Center for Constitutional Rights, New York, NY by Jennifer M. Green, William J. Aceves, Paul L. Hoffman, for Amicus Center for Constitutional Rights.

Alan Vinegrad, United States Attorney, Eastern District of New York, Brooklyn, NY by Scott Dunn, Mary E. Delli–Pizzi, for Respondents Janet Reno et al.

## AMENDED MEMORANDUM AND JUDGMENT

WEINSTEIN, Senior District Judge.

Table of Contents:

I. Introduction ..................................................................586

II. Facts .........................................................................586
 A. Background ............................................................586
 B. Procedural History ...................................................587

III. Law ..........................................................................587
 A. Equal Protection and Due Process.....................................587
 B. Immigration and Naturalization Act ..................................588

 1. Aggravated Felony ............................................588
 2. Section 212(c) Relief ........................................588
 3. Asylum Under Section 208 ..................................591
 4. Withholding of Deportation Under Section 243(h) ........591
 5. Other Statutory Provisions for Relief from Removal .....592
 C. Treaty Obligations ...............................................593
 1. Treaty Power ................................................593
 2. Human Rights Treaties......................................595
 A. International Covenant on Civil and Political Rights .................595
 B. Universal Declaration of Human Rights ............................595
 C. Convention on the Rights of the Child ............................596
 D. Customary International Law......................................596
 1. Definition of Customary International Law.............................596
 2. Authority of Customary International Law .............................597
 3. Provisions of the Convention on the Rights of the Child as Customary
 International Law ...........................................600
 E. Policy Reasons for Honoring International Human Rights Obligations.........601

IV. Application of Law to Facts .........................................603
 A. Relief Under the Immigration and Naturalization Act ......................603
 B. Relief Under the International Covenant on Civil and Political Rights .........603
 C. Relief Under Customary International Law.................................604
 D. Appropriate Remedy ..............................................604

V. Conclusion .........................................................605

## I. Introduction

Petitioner seeks relief from deportation under the Immigration and Naturalization Act, 8 U.S.C. §§ 1101 *et seq.* (INA), or under principles of international law. Because of treaty and international law requirements, applicable immigration statutes should be interpreted to require that petitioner be granted a hearing where he can attempt to show the effect his deportation would have on his family (both citizen and lawful permanent resident aliens) and himself, as against the risks of his continued presence in this country. If the statutes are not so interpreted, then in this instance treaties and international law override the statutes and require such a hearing.

## II. Facts

### A. Background

Petitioner entered the United States from Trinidad as a lawful permanent resident in April of 1982, when he was seven years old. He has resided here without interruption since that time. He completed an eleventh-grade education in the United States and has worked at a variety of jobs here.

Many of petitioner's immediate family live in the United States, including his mother, a lawful permanent resident, and his sister, a United States citizen. He has a six-year-old daughter who is a United States citizen.

In November 1996 petitioner was convicted of robbery in the second degree for an alleged July 1996 theft of $714 from a coffee shop. According to facts presented at his deportation hearing, petitioner acted with the aid of an accomplice and the help of a friend working at the store. He and his accomplice took the money from the cash register.

The record is unclear about whether petitioner and his accomplice used force, displayed an apparent firearm, or were in possession of a firearm when they were arrested. A presentence report indicated that force was used. The insider accom-

plice testified at the deportation hearing that no force was used against her, and that she was not aware of any force being used against the manager. The immigration judge credited her testimony.

Petitioner had unrelated prior criminal violations, including two convictions for petty larceny (one as a juvenile), a conviction for criminal mischief, and a conviction for second degree riot. None resulted in incarceration.

A sentence of two-and-a-quarter to four-and-a-half years was imposed for the robbery. During his incarceration, petitioner secured an interview for employment at a non-profit computer recycling organization. It offered him training and employment. The director wrote a letter to immigration court recommending that he be placed on work release to begin training.

### B. Procedural History

While petitioner was incarcerated, the Immigration and Naturalization Service (I.N.S.) commenced deportation proceedings in February of 1997. He appeared before an immigration judge of the Executive Office for Immigration ·Review at a series of hearings from May 1997 to January 1998. Except for the first hearing petitioner was represented by counsel.

In September 1997 petitioner admitted deportability as an aggravated felon. He requested three types of relief: a compassionate hearing under section 212(c) of the INA; asylum under section 208 of the INA; and withholding of deportation under section 243(h) of the INA. The immigration judge found him 1) statutorily ineligible for 212(c) relief as an excludee; 2) statutorily ineligible for asylum; and 3) not covered by section 243(h) since he did not fall within the special classes enumerated in that section.

A timely appeal was taken to the Board of Immigration Appeals (BIA). It affirmed the administrative judge's decision. The BIA reversed the finding of the immigration judge that petitioner's robbery was not a "serious crime," thus providing another bar to section 243(h) relief.

This petition for a writ of habeas corpus in federal district court followed. Petitioner is presently being detained by I.N.S. awaiting deportation.

### III. Law

#### A. Equal Protection and Due Process

 The Constitution requires that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. It also provides "nor shall any State ... Deny to any Person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The equal protection clause has been held to apply to the Federal government as well as the states. It seems significant that "person" rather than "citizen" is the object of these protections, adding some weight to petitioner's contention that even though he is not a citizen he is entitled to equal protection. "The Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 2499–2500, 150 L.Ed.2d 653, 669 (2001). *See also Landon v. Plasencia*, 459 U.S. 21, 25–28, 103 S.Ct. 321, 325–26, 74 L.Ed.2d 21, 25–28 (1982) (permanent resident aliens are entitled to a high degree of due process, approaching that accorded to citizens); *cf.* Restatement (Third) of Foreign Relations Law (1986) § 701 ("A state is obligated to respect the human rights of persons subject to its jurisdiction."), § 722 ("An alien in the United States is entitled to the guaran-

tees of the United States Constitution other than those expressly reserved for citizens.").

■ Courts have recognized that a right to privacy is related to equal protection and due process. This right has been defined as the "right to be let alone." *See Hill v. Colorado,* 530 U.S. 703, 716–17, 120 S.Ct. 2480, 2489–90, 147 L.Ed.2d 597, 612 (2000) (citing *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944, 956 (1928) (Brandeis, J., dissenting)). At the very least, the right to privacy includes the right to procreate, *see Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), and the right to marry, *see Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). These rights cover a person's relationship with his or her family, including the right to live with one's family and control one's children without unnecessary government interference. *See, e.g., Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (parental right to guide children's upbringing); *Moore v. East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (right of family to live together); *Tenenbaum v. Williams,* 193 F.3d 581 (2d Cir.1999) (right of families to be free from arbitrary state removal of children). Forcible separation of a noncitizen legal resident of this country from his citizen child or spouse implicates this right to familial integrity. *See In Re Sharwline Nicholson, et al.,* CV 00–2229, slip op. at 8–9 (E.D.N.Y. Jan. 3, 2002).

■ The law has been less protective of aliens' rights than of citizens' rights, although equal protection concepts cannot be ignored even in immigration cases. "The power to expel or exclude aliens is a fundamental sovereign attribute exercised by the government's political departments *largely* [but *not completely* ] immune from judicial control." *Fiallo v. Bell,* 430 U.S. 787, 794, 97 S.Ct. 1473, 1479, 52 L.Ed.2d 50, 56–57 (1977) (emphasis and addition supplied).

### B. Immigration and Naturalization Act

The interpretation of the INA by the I.N.S. is arguably compatible with the complex statutory scheme. Were it not for its international implications, a dismissal would arguably be warranted based on a literal reading of the statutes and caselaw. A brief statutory analysis follows.

### 1. Aggravated Felony

The definition of "aggravated felony" is found in INA section 101(a)(43). It includes "a theft offense ... for which the term of imprisonment is at least one year."

At the time petitioner's robbery was committed the definition would not have included his criminal history. Instead of "one year," the earlier version of the statute covered theft offenses actually resulting in a term of imprisonment greater than five years. The maximum petitioner was ordered to serve was four-and-a-half years.

When petitioner pled in November 1996, the one-year definition was in place and petitioner was thereafter an aggravated felon under the INA. This was conceded at his immigration hearing.

### 2. Section 212(c) Relief

Prior to 1996, section 212(c) of the INA allowed immigrants in petitioner's position an opportunity for a discretionary hearing where they could urge waiver of deportation on compassionate grounds. *See I.N.S. v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 2276–78, 150 L.Ed.2d 347, 358–60 (2001) (history of section 212(c)); *Mojica v. Reno,* 970 F.Supp. 130 (E.D.N.Y.1997), *aff'd in*

*part* by *Henderson v. I.N.S.*, 157 F.3d 106 (2d Cir.1998); *Maria v. McElroy*, 68 F.Supp.2d 206, 212 (E.D.N.Y.1999); *Drax v. Ashcroft*, 2001 WL 1464241 (E.D.N.Y. 2001). Section 212(c) was limited and then eliminated by two statutes adopted in 1996, the Antiterrorism and Effective Death Penalty Act (AEPDA) and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) (collectively, the "1996 Acts"). *St. Cyr*, 121 S.Ct. at 2278. Limiting retroactivity, the Supreme Court has required section 212(c) hearings for an alien whose conviction predates the 1996 Acts if the law would have permitted section 212(c) relief under the statute as it existed at the time of conviction. *Id.* at 2293–94.

*St. Cyr* does not answer the question of what happens where the *crime itself* predates the 1996 changes, but the *convictions* came after the 1996 acts. Prior to *St. Cyr*, the court of appeals for the Second Circuit addressed this issue and held that the legal changes created by the 1996 Acts, including the unavailability of section 212(c), apply to petitioners whose criminal acts predate the statutory change, so long as their convictions come after the Acts. *Domond v. I.N.S.*, 244 F.3d 81 (2d Cir. 2001). This, it reasoned, was because "it is the conviction, not the underlying criminal act, that triggers" the new legal consequences. *Id.* at 85 (quotation marks omitted). *Domond* predates the Supreme Court decision in *St. Cyr* by a few months, and that opinion does not mention *Domond*. *Domond*'s reasoning that there is no reliance on the state of the immigration law when committing crimes might be read as conforming with the holding of *St. Cyr*, which focused on an alien's mental state when making a plea bargain, not on the state of mind when the crime is committed. *See St. Cyr*, 121 S.Ct. at 2291–93 ("There can be little doubt that, as a general matter, alien defendants considering whether

to enter into a plea agreement are acutely aware of the immigration consequences of their actions."). The court of appeals for the Second Circuit reaffirmed the *Domond* holding after *St. Cyr. See Kuhali v. Reno*, 266 F.3d 93, 112 (2d Cir.2001) (citing both *St. Cyr* and *Domond* and holding that retroactive redefinition of an aggravated felony does not violate due process or the rule against *ex post facto* changes in criminal law).

Neither *St. Cyr*, *Kuhali* nor *Domond* ruled on the international law questions presented in the instant case and described in detail below. *See infra* Parts III.C, D, and E, and IV. These questions were not briefed in *Kuhali* and *Domond*. In a subsequent important immigration case, the Supreme Court was presented with arguments invoking international law, but did not find it necessary to address them, although they had been addressed by the court of appeals. *Compare Zadvydas*, 121 S.Ct. 2491, 2491 (Breyer, J., majority opinion) (unnecessary to consider arguments in Brief of Lawyers Committee for Human Rights on international law in reaching holding that aliens cannot be detained indefinitely) *and Zadvydas, id.* at 2507, 2515 (Kennedy, J., dissenting) (passing mention of "international views on detention") *with Ma v. Ashcroft*, 257 F.3d 1095, 1114–15 (9th Cir.2001) (discussing international law and the rule of *Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804), that statutes be construed in accordance with international law), *aff'd on other grounds by Zadvydas, supra*. The ninth circuit in *Ma* considered briefs from Human Rights Watch and Lawyers Committee for Human Rights in applying international law and statutory construction principles. *See* 2000 WL 1881913 (Brief of Lawyers Committee for Human Rights); 2000 WL 1890982 (Brief of Human Rights Watch et al.). The Supreme Court's deci-

sion not to consider these issues in *Zadvydas* can be construed as recognition that it was unnecessary to do so given the facts of the case. The matter is open in that court in a case such as the one before us.

■ *Domond* and *Kuhali* could well have gone the other way, even without the requirements of international law. The court of appeals' argument in *Domond* that "It would border on the absurd to argue that these aliens might have decided not to commit drug crimes ... had they known that ... they could not ask for a discretionary waiver of deportation," *Domond*, 244 F.3d at 84, might be viewed by some as missing the mark. Most criminal or civil penalties do not deter drug or other crimes. Nevertheless, the principle of *nulla poena sine lege* (there can be no punishment without law) is central to our legal system. This principle has a long history:

> The principle that a person can be found guilty of a crime and punished for his acts only if the state beforehand has made the commission of those acts a crime and has authorized punishment to be imposed upon proof that a person has in fact committed those acts is at the heart of the "rule of law" characteristic of Anglo–American jurisprudence.... The history of this principle has been traced to Greek and Roman legal systems. This principle also figured prominently in the development of the English common law from a decisional to a statutory system of criminal law.

*U.S. v. Walker*, 514 F.Supp. 294, 316 & n. 20 (D.La.1981). "*Nulla poena sine lege* is not only an ancient maxim; it is a requisite of due process." *U.S. v. Bodiford*, 753 F.2d 380, 382 (5th Cir.1985). A corollary is that the applicable punishment for a crime can not be increased *after* the crime was committed. *See, e.g., Weaver v. Graham*, 450 U.S. 24, 101 S.Ct. 960, 67

L.Ed.2d 17 (1981); *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); *Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977); *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964).

In *Kuhali* the court of appeals rejected the *ex post facto* argument on the ground that "Deportation is a civil, not a criminal proceeding." 266 F.3d at 112; *see also Zadvydas*, 121 S.Ct. at 2499 (assuming for the sake of argument in that case, where the court found for the alien, that immigration proceedings "are nonpunitive in purpose and effect"). Characterizing a serious penalty as civil rather than criminal does not reduce its sting or make it any less punitive. However bottled, poison is toxic. An alternative of exile was, we should recall, rejected by Socrates in favor of hemlock. Plato, Apology 38–39, Crito 44, 50–54, Phaedo 117; Plato, Complete Works 38 (John M. Cooper ed., 1997) ("Did justice really require that Socrates stay to accept his death?"). The Supreme Court has recognized on more than one occasion that "deportation may result in the loss 'of all that makes life worth living'." *Bridges v. Wixon*, 326 U.S. 135, 147, 65 S.Ct. 1443, 1449, 89 L.Ed. 2103, 2112 (1945), *citing* Ng Fung Ho v. White, 259 U.S. 276, 284, 42 S.Ct. 492, 495, 66 L.Ed. 938, 943 (1922). The *Bridges* court declared that:

> The impact of deportation upon the life of an alien is often as great if not greater than the imposition of a criminal sentence. A deported alien may lose his family, his friends and his livelihood forever, Return to his native land may result in poverty, persecution and even death.

*Bridges*, 326 U.S. at 164, 65 S.Ct. 1443. It defies common experience to characterize deportation of an alien such as petitioner as anything other than punishment for his crimes.

Viewed from the perspective of the international law reviewed in this memorandum beginning with *Charming Betsy*, the rationales of *Domond* and *Kuhali* fail to account for the full necessary interpretive statutory background. Immigration statutes must be woven into the seamless web of our national and international law. *See infra* Parts III.C and D.

Some earlier judicial decisions, now recognized as unworthy of our current society, declined to extend constitutional protection to aliens on the ground that deportation is not "punishment." *See, e.g., Harisiades v. Shaughnessy*, 342 U.S. 580, 594, 72 S.Ct. 512, 96 L.Ed. 586 (1952) (cited in *Kuhali*, 266 F.3d at 112) (aliens may be expelled for speech without infringing on first amendment); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953) (indefinite detention of aliens does not violate due process); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned."). This line has been vigorously criticized. *See, e.g.*, Henry M. Hart, Jr., The Power of Congress to Limit the Jurisdiction of the Federal Courts: An Exercise in Dialectic, 66 Harv. L.Rev. 1362, 1389–96 (1953) (criticizing *Knauff* and *Mezei*); Peter Schuck, Citizens, Strangers, and In–Betweens 32 (1998) (*Knauff* and *Mezei* rank among "the most deplorable government conduct toward both aliens and American citizens ever recorded in the annals of the Supreme Court"); Gerald M. Neuman, Strangers to the Constitution 119–36, 188–89 (1997) (criticizing the lack of constitutional protection for aliens).

Such anti-immigrant cases have their roots in earlier, now much-maligned decisions such as *Chae Chan Ping v. United States*, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889), often titled the "Chinese Exclusion Case," which were openly racist and xenophobic in nature. *See generally* Neuman, *supra*, at 19–40, 119–25 (history of early immigration law including explicit race-based exclusion). The Supreme Court has recently taken a divergent path recognizing the due process rights of all people, including aliens. *See, e.g., Zadvydas*, 121 S.Ct. at 2499–2500 (all aliens are entitled to due process; no indefinite incarceration of aliens who cannot be deported); *St. Cyr*, 121 S.Ct. at 2291–93 (right to hearing). *Domond* and *Kuhali* should be reconsidered as the courts interpret and develop the Supreme Court's more recent immigration rulings and the requirements of international law.

### 3. Asylum Under Section 208

Section 208 of the Immigration and Naturalization Act allows aliens present in the United States to apply for asylum if they meet certain conditions. Aggravated felons may not apply for asylum under section 208. INA § 208(b)(2)(A)(ii), § 208(b)(2)(B)(i).

### 4. Withholding of Deportation Under Section 243(h)

Pre–1996 section 243(h) allowed relief to aliens who had not committed a "particularly serious crime" and were members of a protected class. The section reads in relevant part:

(h) Withholding of deportation or return

(1) The Attorney General shall not deport any alien to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

(2) Paragraph (1) *shall not apply* to any alien if the Attorney General determines that—

> (B) the alien, having been convicted by a final judgment of a *particularly serious crime,* constitutes a danger to the community of the United States;

For purposes of subparagraph (B), an alien who has been convicted of an *aggravated felony shall be* considered to have committed a *particularly serious crime.*

(Emphasis added). When petitioner committed his operative crime, an aggravated felony with a sentence of over five years was considered a "particularly serious crime." *Matter of Q–T–M–T,* Interim Decision 3300 (BIA 1996). For aggravated felonies with a sentence of under five years, there was a rebuttable presumption that the offense was a "particularly serious crime." *Id.* Several factors were considered in deciding if the presumption had been rebutted, including the nature of the offense and whether any force was used. *Matter of Frentescu,* 18 I. & N. Dec. 2214 (BIA 1982).

### 5. Other Statutory Provisions for Relief from Removal

The 1996 acts created a new form of relief called cancellation of removal under INA section 240A. Section 240A does not allow cancellation of removal for any aggravated felon. INA § 240A(a)(3).

Section 212(h) of the INA allows waiver of deportation under special circumstances for aliens whose deportation would result in substantial hardship to a citizen spouse or children. Section 212(h) does not apply to a lawful permanent resident alien convicted of an aggravated felony.

The distinction in 212(h) between lawful permanent residents (who are barred from 212(h) relief) and other aliens (who may use the section) has been challenged as a violation of the equal protection clause. The statute is strange, given that lawful permanent residents generally have greater rights than non-residents; they have fewer protections under this provision. *See Landon,* 459 U.S. at 25–28, 103 S.Ct. 321 (rights of lawful permanent residents greater than those of other aliens). This holding is similar to other statements made by the Supreme Court. "The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society." *Johnson v. Eisentrager,* 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950); *see also United States v. Verdugo-Urquidez,* 494 U.S. 259, 269, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (noting Johnson recognition of increased rights for resident aliens).

Several courts of appeal (though not that of the Second Circuit) have upheld the validity of 212(h) against this equal protection attack. *See, e.g., Lara–Ruiz v. I.N.S.,* 241 F.3d 934 (7th Cir.2001); *Moore v. Ashcroft,* 251 F.3d 919, 925 (11th Cir.2001); *Finau v. I.N.S.,* 270 F.3d 859 (9th Cir. 2001); *Umanzor–Lazo v. I.N.S.,* 1999 WL 274075, 178 F.3d 1286 (4th Cir.1999). Arguably, this statutory differentiation among aliens is within Congress's capacity to create categories because of its almost "plenary power" over immigration. *Fiallo,* 430 U.S. at 794, 97 S.Ct. 1473.

One District Court within this Circuit has recently held that section 212(h) violates the equal protection clause because of its unavailability to lawful permanent residents. *Jankowski v. I.N.S.,* 138 F.Supp.2d 269 (D.Conn.2001). This decision is currently on appeal to the court of appeals. *See Barton v. Ashcroft,* 171 F.Supp.2d 86, 92 (D.Conn.2001) (noting appeal on 212(h) issue and refusing to decide while the appeal was pending).

## C. Treaty Obligations

### 1. Treaty Power

The United States may enter into treaties under the Constitution. U.S. Const. Art. 2, sec. 2 (the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two-thirds of the Senators present concur"). Under the Supremacy Clause, "all treaties made" by the United States, along with federal law and the Constitution, are the "supreme law of the land." U.S. Const., Art IV, sec 2.

A treaty has been sometimes said to have force of law only if ratified. Courts, however, often use non-ratified treaties as aids in statutory construction. A number of these cases have been catalogued by professor Steinhardt, who lists:

Rodriguez–Fernandez v. Wilkinson, 654 F.2d 1382, 1388 (10th Cir.1981) (citing the American Convention on Human Rights and the Universal Declaration of Human Rights as support for customary principle prohibiting prolonged arbitrary detention); Filartiga v. Pena–Irala, 630 F.2d 876, 883–85 (2d Cir.1980) (consulting the American Convention on Human Rights and the International Covenant on Civil and Political Rights, inter alia, to determine the customary prohibition on torture); Forti v. Suarez–Mason, 672 F.Supp. 1531, 1542 (N.D.Cal.1987) (recognizing the Universal Declaration, American Convention, and the Civil and Political Covenant as evidence of a customary norm against summary execution), reh'g granted in part and denied in part, 694 F.Supp. 707 (N.D.Cal.1988); Lareau v. Manson, 507 F.Supp. 1177, 1187–89 n. 9 (D.Conn.1980) (discussing the United Nations Minimum Standard Rules Governing the Treatment of Prisoners), modified, 651 F.2d 96 (2d Cir. 1981), aff'd. in part and modified in part, 651 F.2d 96 (2d Cir.1981).

Ralph G. Steinhardt, The Role of International Law as a Canon of Domestic Statutory Construction, 43 Vand. L. Rev 1103, 1182 n. 332 (1990). See also id. at 1180–82 (discussing the weight courts attach to non-ratified treaties).

Treaties are generally treated as self-executing, that is, they are enforceable in courts once signed and ratified. Some treaties are non-self-executing, meaning that they do not have the force of domestic law until separate "implementing legislation" is passed. This concept dates back to Chief Justice Marshall's statement in Foster v. Neilson, 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415, 436 (1829), that:

> A treaty is to be regarded in the courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision ... But when the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial, department; and the legislature must execute the contract before it can become a rule for the Court.

A decision on self-execution may be based on the treaty structure, whether the treaty implies a contract with the legislature, and whether the treaty would infringe on Constitutional provisions if treated as self-executing (such as a treaty promising to appropriate funds). See Louis Henkin, Foreign Affairs and the Constitution 200–02 (1996).

Beginning in the 1950's, Congress informally adopted a policy of either not ratifying human rights treaties or attaching "reservations, understandings, and declarations" ("RUDs") to them which often declared them to be non-self-executing. Henkin, supra, at 202 & n. 101 (history of recent trend towards RUDs). For exam-

ple, the International Covenant on Civil and Political Rights (ICCPR) was ratified with a RUD declaring that it would be non-self-executing.

RUDs are controversial. Professor Henkin has declared RUDs to be "anti-Constitutional in spirit and highly problematic as a matter of law." *Id.* at 202.

> Nothing in the Constitution, or in Chief Justice John Marshall's [*Foster*] opinion, suggested that treaties which the Constitution declares to be the law of the land need not be "faithfully executed" by the President, or enforced by the Courts, because the President or the Senate (or both) so decided.

*Id. But see* Curtis A. Bradley & Jack L. Goldsmith, Treaties, Human Rights, and Conditional Consent, 149 U. Pa. L.Rev. 399, 401–04 (2000) (RUDs are both constitutional and useful). The Restatement of Foreign Relations Law Reporter's note states that: "If a treaty is not self-executing for a state party, that state is obligated to implement it promptly, and failure to do so would render it in default under its treaty obligations." Restatement (Third) of Foreign Relations Law § 111, Reporters' Note 5; *see also id.* at § 115(1)(b) ("That a rule of international law or a provision of an international agreement is superseded as domestic law does not relieve the United States of its international obligation or of the consequences of a violation of that obligation.").

The President is primarily charged with conducting foreign affairs, and his acceptance of a treaty has a bearing on developing international law and the courts' obligations to take notice of this country's international obligations. *Cf.* George W. Bush, President's Statement on Biological Weapons, Nov. 1, 2001, available at http://www.whitehouse.gov/news/releases/2001/11/20011101.html (signatories to the Biological Weapons Convention

("BWC") have an obligation to pass implementing legislation); Statement of Under Secretary of State John R. Bolton, November 19, 2001, available at http://usinfo.state.gov/topical/pol/arms/stories/01111902.htm ("Too many states are parties to the BWC but have not lived up to their commitments.").

Some courts have upheld RUDs. *See, e.g., Beazley v. Johnson,* 242 F.3d 248, 263–68 (5th Cir.2001) (finding that ICCPR provisions barring imposition of the death penalty for crimes committed before the age of eighteen did not apply since the ICCPR was non-self-executing); *see also Igartua De La Rosa v. United States,* 32 F.3d 8, 10 n. 1 (1st Cir.1994) (per curiam) (rejecting a voting rights claim which was based in part on ICCPR). Neither the Supreme Court nor the court of appeals for the Second Circuit seems to have ruled on the validity of RUDs.

Other court decisions assume that provisions of non-self-executing treaties may have domestic effect. The court of appeals for the Second Circuit has allowed provisions from some non-self-executing treaties to influence its decision in at least two cases. *See United States v. Toscanino,* 500 F.2d 267, 276–77 (2d Cir.1974) (reversing a lower court ruling that allegations of government kidnaping and torture of a defendant would not require dismissal of the case if proved, and distinguishing prior inconsistent cases on the grounds that they did not involve "violation of international treaties" even though the two treaties in question, the United Nations Charter and the Organization of American States charter, were non-self-executing); *Filartiga v. Pena–Irala,* 630 F.2d 876, 882 & n. 9 (2d Cir.1980) (noting that while a treaty may be non-self-executing, "this observation alone does not end our inquiry" and pointing out that the earlier *Toscanino* court gave legal effect to a non-self-

executing treaty "as evidence of binding principles of international law"). *See also* Louis Henkin, "Evolving Concepts of International Human Rights and the Current Consensus," 170 F.R.D. 275, 281–84 (1997) (paper presented at the International Human Rights Session, Judicial Conference—Second Circuit, June 15, 1996) (non-formally-binding treaties may be an important tool in statutory construction); *Mojica,* 970 F.Supp. at 147 (citing Professor Henkin's paper as well as other authorities in determining human rights obligations of the United States).

## 2. Human Rights Treaties

The United States is party to a number of treaties, among them the ICCPR and the Convention on the Rights of the Child (CRC). *See* Office of the United Nations High Commissioner for Human Rights, Status of Ratifications of the Principal Human Rights Treaties, Sept. 20, 2001 (available online at www.unhchr.ch). The United States is also a member of the United Nations which has adopted the Universal Declaration of Human Rights (UDHR). This section analyzes each of these treaties.

### A. International Covenant on Civil and Political Rights

Article 13 of the ICCPR requires that an alien lawfully residing in a territory "be allowed to submit the reasons against his expulsion" unless compelling interests of national security require otherwise. The ICCPR is particularly forceful in defense of the rights to privacy and family integrity. As noted in *Maria:*

> The ICCPR provides that "[n]o one shall be subjected to arbitrary or unlawful interference with his ... family...." ICCPR, art. 17. Applying this requirement in the context of deportation laws, the United Nations Human Rights Com-

mittee has explicitly recognized that deportation from a country in which close family members reside can constitute an interference with family life.

*Maria,* 68 F.Supp.2d at 232 (citation omitted). The ICCPR also states that "the family is the natural and fundamental group unit of society and is entitled to protection by society and the State." ICCPR Article 23(1). Separating a parent from a citizen child by forced deportation can be considered a violation of the ICCPR if no adequate hearing is afforded.

Article 7 of the ICCPR prohibits "cruel, inhuman, or degrading treatment." Arbitrary separation from one's family and longtime home can reasonably be interpreted to fall within that general category.

The ICCPR is a signed, ratified treaty. It came with attached reservations of non-self-execution. This has led some courts to disregard some of its parts. *See, e.g., Beazley,* 242 F.3d at 263–68; *but see Maria,* 68 F.Supp.2d at 231–35 (reliance on the ICCPR to interpret provisions of the 1996 Acts). It is significant that the Senate Committee on Foreign Relations stated that "existing U.S. law generally complies with the Covenant." Sen. Exec. Rep. 102–23 (Mar. 24, 1992).

### B. Universal Declaration of Human Rights

The UDHR contains a provisions prohibiting the imposition of "arbitrary ... exile." *See* UDHR, Article 9. It also states that "everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations". UDHR, Article 10. The United States, under the leadership of Eleanor Roosevelt, played a key role in the drafting of the UDHR. *See* Mary Ann Glendon, A World Made New: Eleanor Roosevelt and the Universal Declaration of Human Rights (2001).

While the UDHR is not a treaty, it has an effect similar to a treaty. *See Filartiga*, 630 F.2d at 883 (The UDHR is "an authoritative statement of the international community"). It is a declaration published by the General Assembly of the United Nations "as a common standard of achievement for all peoples and all nations." *See* Preamble, Universal Declaration of Human Rights; Restatement (Third) of Foreign Relations Law § 701, Reporter's Note 6 ("The Declaration has become the accepted general articulation of recognized rights."). U.S. Dept. of State, "Human Rights," available at www.state.gov/g/drl/hr/ ("A central goal of U.S. foreign policy has been the promotion of respect for human rights, as embodied in the Universal Declaration of Human Rights."). Provisions of the UDHR may be used in statutory construction. *See Mojica*, 970 F.Supp. at 146–48 (using the UDHR in statutory construction). The UDHR is helpful in resolving questions of international human rights law. *See Rodriguez–Fernandez v. Wilkinson*, 654 F.2d 1382 (10th Cir.1981) (using UDHR provisions as well as other methods of interpretation to conclude that indefinite detention of aliens was not permissible); *Fernandez v. Wilkinson*, 505 F.Supp. 787, 795–96 (D.Kan. 1980). The UDHR has also been utilized in weighing the constitutionality of provisions of the 1996 Acts. *See Maria*, 68 F.Supp.2d at 231–35; *Mojica*, 970 F.Supp. at 147 (examining the obligations created under the UDHR); Restatement (Third) of Foreign Relations Law § 701 cmt. d ("It is increasingly accepted that states parties to the [United Nations] Charter are legally obligated to respect some of the rights recognized in the Universal Declaration.").

### C. Convention on the Rights of the Child

The CRC declares in its preamble that "the family, as the fundamental group of society and the natural environment for the growth and well-being of all its members and particularly children, should be afforded the necessary protection and assistance.... [T]he child .. [s]hould grow up in a family environment." Article 3 states that "[i]n all actions concerning children, whether undertaken by private or public social welfare institutions, courts of law, administrative authorities or legislative bodies, the best interests of the child shall be a primary consideration." Article 7 provides children with, "as far as possible, the right to know and be cared for by his or her parents." Commentators have noted that the CRC is designed to protect both parental and children's interests: "The child's well-being normally is best-served through the assumption, by parents or legal guardians, of primary responsibility for the child." A. Glenn Mower, Jr., The Convention on the Rights of the Child: International Law Support for Children 55 (1997); *see also* Lawrence J. LeBlanc, The Convention on the Rights of the Child 112–17 (1995) (noting the rights of families under the CRC).

The United States signed the CRC on February 16, 1995; it has never been sent to the Senate for ratification, but every other nation except Somalia—which is effectively without a government—has ratified the CRC. The CRC does not have the force of domestic law under the treaty clause of the Constitution. Non-ratification does not, however, eliminate its impact on American law. *See supra* Part III.C.1 (discussing the impact of signed, non-ratified treaties).

### D. Customary International Law

### 1. Definition of Customary International Law

Customary international law is not static. It is subject to change as customs

change. Customs are not always well-defined. "Evidence of customary international law is found in (1) the general usage and practice among nations, (2) the works of jurists and writers, and (3) judicial decisions recognizing and enforcing that law." *Maria*, 68 F.Supp.2d at 233. *See, e.g.,* Black's Law Dictionary, "Customary Law" (7th ed.1999) ("practices and beliefs that are so vital and intrinsic a part of a social and economic system that they are treated as if they are laws"); Merriam–Webster's Collegiate Dictionary, "Custom" (10th ed.1999) ("1(a): a usage or practice common to many"); The Compact Edition of the Oxford English Dictionary, "Customary" 631–32 (1971) ("A written collection of customs").

International law based upon custom can be said to be influenced by breadth and period of acceptance, as well as by opinions of scholars, judges and others. It is conceivable that a standard could become customary international law with just one of these factors if it is strong enough. For example, an international norm with exceptionally broad acceptance, even if its existence has been relatively short, could be considered a rule of customary international law. "The practice necessary to create customary law might be of comparatively short duration, but … it must be 'general and consistent.'" Restatement (Third) of Foreign Relations Law, § 102 cmt. b. This standard was reaffirmed by the *Filartiga* decision of the court of appeals for the Second Circuit which stated that "a standard that began as one of comity only, had ripened … into 'a settled rule of international law' by 'the general assent of civilized nations.'" *Filartiga*, 630 F.2d at 881 (quoting *Habana*, 175 U.S. at 694, 20 S.Ct. at 297). The principle of change was also endorsed by Joseph Story, who wrote:

It does not follow, … that because a principle cannot be found settled by the consent or practice of nations at one time, it is to be concluded, that at no subsequent period the principle can be considered as incorporated into the public code of nations. Nor is it to be admitted, that no principle belongs to the law of nations, which is not universally recognised, as such, by all civilized communities, or even by those constituting, what may be called, the Christian states of Europe. Some doctrines, which we, as well as Great Britain, admit to belong to the law of nations, are of but recent origin and application, and have not, as yet, received any public or general sanction in other nations....

*United States v. La Jeune Eugenie*, 26 F.Cas. 832, 846 (D.Mass.1822) (No. 15,551), *cited in* Steinhardt, *supra,* at 1178 n. 317.

In terms of "tradition" and "custom" and their definition as a chronological matter, the courts take into account several new factors. These include the rapidity with which norms of personal rights have changed since World War II, the creation of the United Nations, and the increased influence on international affairs by the United States—founded on the protection of human rights—as a superpower.

### 2. Authority of Customary International Law

■ United States courts may not ignore the precepts of customary international law. *See, e.g., Charming Betsy,* 6 U.S. at 118, 2 Cranch 64; *The Paquete Habana,* 175 U.S. 677, 694–700, 20 S.Ct. 290, 297–300, 44 L.Ed. 320, 326–29 (1900); *The Nereide,* 13 U.S. (9 Cranch) 388, 423, 3 L.Ed. 769, 780 (1815); *Filartiga,* 630 F.2d at 881; *Mojica,* 970 F.Supp. at 146–52; *Maria,* 68 F.Supp.2d at 233–35. This concept has been most clearly embodied in admiralty cases, where domestic law may directly clash with customary international

law. The Supreme Court has long recognized the principle that in admiralty United States courts are "bound by the law of nations, which is part of the law of the land." *The Neriede*, 13 U.S. at 423, 9 Cranch 388 (1815). *See also The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (federal courts are to apply the law of nations as federal law). In general, customary international law has the same status as domestic legislation. Restatement (Third) of Foreign Relations Law § 701 cmt. e ("The United States is bound by the international customary law of human rights."); *cf. Kadic v. Karadzic*, 70 F.3d 232 (2d Cir.1995) (finding violation of customary international human rights law in war atrocities in Bosnia conflict).

Like admiralty, immigration law is founded on international law. The Supreme Court has repeated that the basis for Congress's extremely broad power over aliens comes not from the Constitution itself, but from international law. *"It is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions."* *Nishimura Ekiu v. United States*, 142 U.S. 651, 659, 12 S.Ct. 336, 338, 35 L.Ed. 1146, 1149 (1892) (emphasis added). It is because of international norms that Congress has such broad authority:

> That aliens remain vulnerable to expulsion after long residence is a practice that bristles with severities. But it is a weapon of defense and reprisal confirmed by international law as a power inherent in every sovereign state. Such is the traditional power of the Nation over the alien and we leave the law on the subject as we find it.

*Harisiades*, 342 U.S. at 587–88, 72 S.Ct. 512; *see also Fong Yue Ting v. United States*, 149 U.S. 698, 706–14, 13 S.Ct. 1016,

37 L.Ed. 905 (1893) (Congress's power to exclude aliens, like the power to expel aliens, stems from international law); *Chae Chan Ping*, 130 U.S. at 581, 9 S.Ct. 623 (similar). The *Harisiades* court further noted that "a State can expel even domiciled aliens without so much as giving the reasons." *Id.* at 588 n. 14, 72 S.Ct. 512. As authority for this proposition, the Court cited to Oppenheim's 1920 treatise (3d ed.) on international law. *Id.* That treatise has, of course, been superceded. The *Harisiades* decision, meanwhile, was cited by the court of appeals for this circuit in its recent *Kuhali* decision.

Since congress's power over aliens rests at least in part on international law, it should come as no shock that it may be limited by changing international law norms. *See supra* Parts III.C.1 and 2 (changes in international law). It is inappropriate to sustain such plenary power based on a 1920 understanding of international law, when the 2002 conception is radically different. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 173, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989) (courts must reevaluate past precedents where the "intervening development of the law" has "weakened the conceptual underpinnings from the prior decision"). One court of appeals has already embraced this principle:

> We note that in upholding the plenary power of Congress over exclusion and deportation of aliens, the Supreme Court has sought support in international law principles. It seems proper then to consider international law principles for notions of fairness.

*Rodriguez–Fernandez v. Wilkinson*, 654 F.2d 1382, 1388 (10th Cir.1981).

■ United States courts should interpret legislation in harmony with international law and norms wherever possible. "An act of Congress ought never to be

construed to violate the law of nations if any other possible construction remains." *Charming Betsy*, 6 U.S. at 118, 2 Cranch 64. This opinion was authored by Chief Justice John Marshall. Marshall and other members of that court were of the generation that had written the Constitution; Justice Marshall is widely viewed as the premier interpreter of that document. *See, e.g.*, Jean Edward Smith, John Marshall: Definer of a Nation xi, 1–2 (statements of Chief Justice Marshall's influence).

■ Congress may override provisions of customary international law. *See The Paquete Habana*, 175 U.S. at 694, 20 S.Ct. 290. This rule interacts with the "Charming Betsy" principle to create a principle of clear statement: since Congress may overrule customary international law (*Paquete Habana*), but laws are to be read in conformity with international law where possible (*Charming Betsy*), it follows that in order to overrule customary international law, Congress must enact domestic legislation which both postdates the development of a customary international law norm, and which clearly has the intent of repealing that norm. *See, e.g., Maria*, 68 F.Supp.2d at 231 ("Congress can be assumed, in the absence of a statement to the contrary, to be legislating in conformity with international law and to be cognizant of this country's global leadership position and the need for it to set an example with respect to human rights obligations."); Restatement (Third) of Foreign Relations Law § 115(1)(a) ("An Act of Congress supercedes an earlier rule of international law or a provision of an international agreement as law of the United States if the purpose of the act to supercede the earlier rule or provision is clear and if the act and the earlier rule or provision cannot be fairly reconciled."). *Cf. Zadvydas*, 121 S.Ct. at 2502 ("Where Congress has made

its intent in the statute *clear*, we must give effect to that intent.") (internal quotations omitted; emphasis supplied); *St. Cyr*, 121 S.Ct. at 2287–90 (Congress may enact *ex post facto* law removing an alien's right only with a clear statement).

The need to harmonize domestic and international law is well recognized. The Supreme Court limited provisions of the National Labor Relations Act so as to accord with international law, in large measure because parts of the statute had "aroused vigorous protests from foreign governments and created international problems for our Government." *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 17, 83 S.Ct. 671, 675, 9 L.Ed.2d 547, 553 (1963). It held in *Lauritzen v. Larsen* that admiralty law under the Jones Act should be construed in conformity with international law. 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). The Court has relied upon the need to avoid international "retaliations." *Lauritzen*, 345 U.S. at 582, 73 S.Ct. 921; *cf. Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 312, 90 S.Ct. 1731, 1735, 26 L.Ed.2d 252, 257–58 (1970) (Harlan, J. dissenting) (lower courts should determine applicability of domestic admiralty law in part by examining "the relevant interests of foreign nations in the regulation of maritime commerce as part of the legitimate concern of the international community").

A clash of international and domestic law is somewhat analogous to the conflict between the laws of different states. *Cf.* Black's Law Dictionary (7th ed.1999) ("conflict of laws" is also termed "(in international contexts) *private international law*") (emphasis added). In conflicts of laws, courts must weigh the interest each forum has in the issue at hand. *See Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963) (establishing a "balancing of interests" test

for conflicts of laws cases); Harold L. Korn, The Choice–of–Law Revolution: A Critique, 83 Colum. L.Rev. 827–43, 960–62 (1983) (examining the *Babcock* balancing of interests test). Similarly, it is appropriate for courts to balance domestic and international law concerns when these conflict, treating the international community as a distinct legal entity, but remembering that in the deportation context these cases tend to represent a two nation problem—the United States as a nation of real long-term domicile and the foreign country as a nation of technical citizenship. Analyzing these international law matters in a way similar to conflicts cases would complement the clear statement rule. A clear statement from Congress on an issue would control because it would show the overriding interest of the local forum (the United States) on that issue.

■ Where a statute appears to contradict international law, an appropriate remedy is to construe the statute so as to resolve the contradiction. *See generally* Steinhardt, *supra*, at 1143 & n. 177 (listing numerous cases in which courts have construed smuggling and drug statutes to bring them into conformity with international jurisdictional and admiralty law). Customary international law is legally enforceable unless superceded by a clear statement from Congress. Such a statement must be unequivocal. Mere silence is insufficient to meet this standard. *Cf.* Steinhardt, *supra*, at 1165 ("The claim that a statutory ambiguity should be resolved in conformity with international principles is not foreclosed by the failure of Congress to implement these principles in the statute itself.").

### 3. Provisions of the Convention on the Rights of the Child as Customary International Law

The CRC has been adopted by every organized government in the world except the United States. This overwhelming acceptance is strong reason to hold that some CRC provisions have attained the status of customary international law. As at least one court of appeals had explicitly stated, "international human rights instruments ... are evidence of customary international law." *Alvarez-Machain v. United States*, 266 F.3d 1045 (9th Cir. 2001), citing *Siderman de Blake v. Argentina*, 965 F.2d 699 (9th Cir. 1991).

While the CRC is relatively new, it contains many provisions codifying longstanding legal norms. It states that "the family ... should be afforded the necessary protection and assistance" and that "in all actions concerning children ... the best interests of the child shall be a primary consideration." CRC, Preamble and Art. 3. These provisions of the CRC are not so novel as to be considered outside the bounds of what is customary. Similar doctrines have long been a part of our law. *See, e.g., Tenenbaum*, 193 F.3d at 594 (noting that in family law situations of abuse, "the child's welfare predominates over other interests."); 59 Am.Jur.2d *Parent and Child* § 10 (1987) (general tenets of family law including best interests of the child); 2 Am.Jur.2d *Adoption* § 136 (1994) (in adoption, "best interests of the child" is the paramount consideration). As already noted, they are related to the constitutional right to privacy under United States law. They are also applied by other nations. For example, there is an extensive jurisprudence in Europe supporting judicial enforcement of the right to family integrity. *See, e.g.,* D.J. Harris *et al.,* Law of the European Convention on Human Rights 327–38 (1995) (cases in Europe where courts have found that the right to family integrity made some state action invalid); Murray Hunt, Using Human Rights Law in English Courts 236–39

(1997) (noting that some European courts have given weight to treaties which were not adopted in order to protect the right to family integrity). Given its widespread acceptance, to the extent that it acts to codify longstanding, widely-accepted principles of law, the CRC should be read as customary international law. "The rights to be free from arbitrary interference with family life and arbitrary expulsion are part of customary international law." *Maria*, 68 F.Supp.2d at 234.

Congress's failure to ratify the CRC is not a sufficiently clear statement to constitute repudiation of the customary international law principles contained in and underlying this treaty. This ruling of law does not mean that other, more novel sections of the CRC must be adopted as customary international law. This is especially true for some novel sections of the CRC which Congress has specifically sought to repudiate, such as provisions intended to regulate the application of the death penalty.

### E. Policy Reasons for Honoring International Human Rights Obligations

This nation's credibility would be weakened by non-compliance with treaty obligations or with international norms. The United States seeks to impose international law norms—including, notably, those on terrorism—upon other nations. It would seem strange, then, if the government would seek to avoid enforcement of such norms within its own borders. A former Chief Judge of the court of appeals in this Circuit recognized this concern. Comparing current judicial unease with human rights treaties to post-revolutionary unease with the Supremacy Clause, he stated:

> There are international supremacy clauses which have civil consequences and criminal consequences that we today are currently not comfortable with.... Once this country says there is a U.N. Charter, there are U.N. covenants, there are treaties, and we subscribe to them, in effect, having something of an international supremacy clause, then there are going to be civil and perhaps criminal consequences that we might not all think are so wonderful. But you can't simply say that we're going to have treaties for the rest of them but, of course, they won't apply to us.

Statement of Jon O. Newman, 170 F.R.D. 201, 317–18 (1996) (Judicial Conference of the Second Circuit). "A central goal of U.S. foreign policy has been the promotion of respect for human rights ... The United States understands that the existence of human rights helps secure the peace, deter aggression, promote the rule of law, combat crime and corruption, strengthen democracies, and prevent humanitarian crises." U.S. Dept. of State, "Human Rights," available online at www.state.gov/g/drl/hr/.

The United States cannot expect to reap the benefits of internationally recognized human rights—in the form of greater worldwide stability and respect for people—without being willing to adhere to them itself. As a moral leader of the world, the United States has obligated itself not to disregard rights uniformly recognized by other nations. Thus, United States courts act appropriately when they construe statutory programs in accordance with international law; they avoid a construction which, "if given its literal application, would threaten the interests of the United States by placing the Nation in violation of international standards or embarrassing the political branches in their conduct of foreign relations." *Steinhardt, supra*, at 1197. The United States also recognizes the problems of the potential receiving state which may not welcome a

long-term United States resident, particularly one convicted of a crime; in effect, such a person will be in limbo. *Cf. Zadvydas*, 121 S.Ct. at 2502 (striking down I.N.S. policy of indefinite detention where there is no convenient receiving state).

A second consideration is the need to justify the radical disparity in the punishment meted out to citizens as compared to non-citizens under the statute. Petitioner has been convicted of a possible non violent second degree robbery of $714. He was also convicted of a drug offense. The total prison sentence he received for all his crimes was 27 to 54 months. Amicus notes that, due to the operation of INA section 212(a)(2)(C), petitioner is inadmissible for reentry to the United States. Amicus Brief at 3. His actual sentence is a probable life term of separation from his home, family, job, and adopted country. For comparative purposes, a similar sentence (27 to 54 months) would be appropriate under the Federal guidelines for the appropriate offense levels 14, which carries a sentence of 27 months, through level 21, which bears a sentence of 54 months (these numbers assume petitioner to be in Criminal History category III, which appears likely given his prior offenses). Lifetime separation from family—via life imprisonment—is not an option under the guidelines until offense level 40, which is reserved for the most heinous of offenses. Likening deportation to a life sentence in not hyperbole; the Supreme Court has, as already noted, recognized on more than one occasion that "deportation may result in the loss 'of all that makes life worth living'." *Bridges v. Wixon*, 326 U.S. 135, 147, 65 S.Ct. 1443, 1449, 89 L.Ed. 2103, 2112 (1945), *citing Ng Fung Ho v. White*, 259 U.S. 276, 284, 42 S.Ct. 492, 495, 66 L.Ed. 938, 943 (1922). In concurrence, Judge Murphy stated:

> The impact of deportation upon the life of an alien is often as great if not greater than the imposition of a criminal sentence. A deported alien may lose his family, his friends and his livelihood forever. Return to his native land may result in poverty, persecution and even death.

*Bridges*, 326 U.S. at 164, 65 S.Ct. at 1457 (Murphy, J., concurring). Commentators have pointed out the incongruity that "an alien convicted of possession of more than thirty grams of marijuana may be deported, while a citizen convicted of mass murder cannot be." Kevin R. Johnson, "Aliens" and the U.S. Immigration Laws: The Social and Legal Construction of Non–Persons, 28 U. Miami Inter–Am. L.Rev. 263, 265 (1997). "Society is ethically obligated to treat people, including aggravated felons, fairly. This end is not served by removing aliens without giving them the opportunities to present their individual circumstances to administrative or Article III judges." Alexander Tsesis, Toward a Just Immigration Policy: Putting Ethics into Immigration Law, 45 Wayne L.Rev. 105, 168 (1999).

Draconian punishment of aliens, as compared to citizens, is based on formal legal status. It ignores the claims of all people, including aliens, to universal rights of "personhood." *See* Schuck, supra, at 202; *see also* Harry S. Truman, Inaugural Address, January 1949 ("Decent, satisfying life . . . is the right of all people"). Unusually cruel and harsh treatment of aliens is directly tied to their status as a relatively weak minority group. Such groups require diligent attention by courts to ensure that their rights are not unnecessarily violated by the majority. *See United States v. Carolene Products Co.*, 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234, 1241 n. 4 (1938) (courts must be diligent to guard the rights of "discrete and insular" minorities); Lewis F. Powell, Carolene Products Revisited, 82 Colum. L.Rev. 1087, 1088 (1982); Louis Lusky, Footnote

Redux: A Carolene Products Reminiscence, 82 Colum. L.Rev. 1093, 1095–1100 (1982); John Hart Ely, Democracy and Distrust 77–79 (1980) (explaining and elaborating the rule of *Carolene Products*).

Aliens as a group contribute to the national economy. Our nation has a decidedly schizophrenic attitude towards them— encouraging their arrival on the one hand for the economic benefit and other advantages they bring, while condemning them on the other as easy targets without political clout. *Cf.* David Barboza, Meatpackers' Profits Hinge on Pool of Immigrant Labor, N.Y. Times, Dec. 21, 2001 ("a major effort to crack down on the hiring of illegal workers could disrupt the nation's food industry"). As one commentator aptly notes:

"We may be said to have incurred moral obligations to illegal aliens by encouraging them to migrate here, by enriching ourselves through their labor, by absorbing them into our communities [and] by inviting legitimate expectations of humane treatment."

Schuck, *supra*, at 213. This case presents another of the many situations in which courts are obliged to "integrate ... classical doctrines and practices into a public law committed to protecting the rights of individuals, including immigrants, against government overreaching and procedural unfairness." *Id.* at vii.

## IV. Application of Law to Facts

### A. Relief Under the Immigration and Naturalization Act

■ Petitioner is ineligible for relief under a narrow and wooden construction of the INA. As an aggravated felon (as now defined), he would not qualify for relief under section 212(h), section 240A, or for asylum under section 208. Because his plea came after the 1996 Acts, he would not be eligible—at least as the ap-

pellate cases have so far indicated—for section 212(c) relief. Petitioner would not qualify for section 243(h) relief because he is not a member of a protected class under that section. Even if he were a member of a 243(h) class, his "serious" crime would now preclude relief under that section.

Petitioner admits that section 212(h) is inapplicable in terms of its own language, but asserts that the denial of 212(h) relief to long-time lawful permanent residents who are technically "aggravated felons" under the new, current definition of this term violates the equal protection clause. The court declines at present to address this claim because it is unnecessary to do so. *See also Barton v. Ashcroft*, 171 F.Supp.2d at 92 (holding in abeyance this issue, because "it would be prudent to grant Respondents' request that this Court hold in abeyance a decision on this specific issue pending the outcome of the appeal in *Jankowski* ").

### B. Relief Under the International Covenant on Civil and Political Rights

The "ICCPR prevents a nation from separating families in a manner that, while in accordance with its domestic law, is nonetheless unreasonable and in conflict with the underlying provisions of the ICCPR." *Maria*, 68 F.Supp.2d at 232. The *Maria* decision was not reversed; the holding was approved on other grounds in separate Second Circuit and Supreme Court cases. *St. Cyr v. I.N.S.*, 229 F.3d 406 (2d Cir.2000), *aff'd sub nom I.N.S. v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).

While the ICCPR is non-self-executing, provisions of non-self-executing treaties have been employed before by both this court and the court of appeals for the second circuit. *See* discussion *supra* Part III.C.1 (noting that *McElroy, Filartiga*

and *Toscanino* opinions rely on provisions of non-self-executing treaties).

Summary deportation of this long term legal alien without allowing him to present the reasons he should not be deported violates the ICCPR's guarantee against arbitrary interference with one's family, and the provision that an alien shall "be allowed to submit the reasons against his expulsion." The statute must be interpreted in a way not inconsistent with international law to permit a compassionate hearing.

Interpreting the statute in conformity with the ICCPR will also remedy any possible incompatibility with the Universal Declaration of Human Rights, which prohibits "arbitrary ... exile", UDHR Art. 9, and also requires that parties be allowed a full and fair hearing. UDHR, Art. 10. *See also supra* Part III.C.2.B (rights under UDHR).

### C. Relief Under Customary International Law

As noted above, the CRC, because of its broad acceptance, collects and articulates customary international law. It is a codification of now longstanding, uniformly-accepted legal principles. If read as the government suggests, the INA would violate the principles of customary international law that the best interests of the child must be considered where possible. Categoric denial of a hearing and thus of any consideration of the child's interests in all cases of theft where the sentence exceeds a year is not in compliance with that international mandate.

It is not disputed that Congress could override this norm of customary international law if it chose to do so. It has not expressed a clear intent to overrule this principle of customary international law which is otherwise binding upon United States courts. "The statutes under which

Mr. Beharry is being deported [do] not explicitly authorize the separation of an alien from immediate family members." Amicus Brief at 18. The court construes the statute in conformity with international law, as mandated by the *Charming Betsy* doctrine.

### D. Appropriate Remedy

As now interpreted and implemented against this petitioner, the statute would violate treaty obligations and customary international law. It is appropriate to interpret the statute in a way which does not violate international law. Since both statutes and international law are enforceable under the Constitution's Supremacy Clause, the statute should be construed in conformity with international law to avoid a constitutional issue if "fairly possible." *See, e.g., Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932); *Zadvydas,* 121 S.Ct. at 2501. In this task the court should make the minimal changes necessary to bring the statute into compliance.

Section 212(h) of the Immigration and Naturalization Act allows discretionary relief from deportation for aliens who have established seven years of residence in the United States, and who have family members in the United States who would suffer "extreme hardship" if the alien is removed.

The most narrowly targeted way to bring the INA into compliance with international law requirements is to read into section 212(h) a requirement of compliance with international law. Those aliens eligible for section 212(h)—those who have seven years or more of residence, and whose removal would cause an "extreme hardship" to legally present family members— are already a carefully selected group with close ties to this country. It would be a violation of international law to categori-

cally deny to all members of this group who have been denominated after their crime was committed as "aggravated felons," relief under the provision. The statutory provision "No waiver shall be provided ... if ... the alien has been convicted of an aggravated felony" should be narrowly construed so as to accord with international law. That can be done by ruling that section 212(h) waivers are available for aliens, including petitioner, who meet its stringent requirements of seven years residence and "extreme hardship" to family—if these aliens have been convicted of an "aggravated felony" as defined after they committed their crime, but which was not so categorized when they committed the crime.

It should be emphasized that such an interpretation does not constitute a ruling that petitioner cannot be deported. He is only entitled to a hearing at which a broad discretion to exclude may be exercised by the INS. *See Palmer v. I.N.S.*, 4 F.3d 482, 487 (7th Cir.1993) (in a 212(h) hearing, the alien bears the burden of showing "equities meriting favorable exercise of the Attorney General's discretion").

This interpretation will affect only a small subset of the aliens who would otherwise be ineligible for section 212(h) relief. It fulfills the goal of bringing the statute into compliance with international law, while doing so in the least intrusive way possible. For example, this statute already contains a separate provision prohibiting 212(h) relief for aliens convicted of murder, torture, or who are a security threat to the United States, provisions which are unchallenged and unaffected by this ruling.

Were the court of appeals to rule, in light of *St. Cyr*, international law and other considerations already described, that the operative time from which to define retroactivity under the statute is the moment the crime was committed, rather than the date of conviction—a tenable and sound conclusion, which would replace the current *Domond* rule—then international law would provide a sound interpretive basis supporting that result. *See Charming Betsy*, 6 U.S. at 118, 2 Cranch 64, *see also supra* Parts III.C and D (discussing international treaty obligations and customary international law). That would obviously be a more comfortable rationale than one depending upon international law *ex proprio vigore*. Placing reliance wholly on international law may have the disadvantage of perhaps inhibiting Congressional power more than may be desirable or necessary.

## V. Conclusion

The writ is granted. The I.N.S. is ordered to conduct a hearing under section 212(h) to determine whether petitioner may remain in the United States. The judgment is stayed pending completion of appellate proceedings if any.

SO ORDERED.