423 F.3d 121
 Arturo Rafael GUAYLUPO-MOYA, Petitioner-Appellant,
v.
Alberto R. GONZALES, Attorney General
of the United States,* Edward McElroy, New York District Director for Immigration and Naturalization Service, Ins, Respondents-Appellees.
 Docket No. 04-5479 PR.
 United States Court of Appeals, Second Circuit.
 Argued: April 20, 2005.
 Decided: September 12, 2005.
 
 Jorge Guttlein, Aranda & Guttlein, New York, NY, for Petitioner-Appellant.
 Patricia L. Buchanan, Assistant United States Attorney (David N. Kelley, United States Attorney for the Southern District of New York; Kathy S. Marks, Assistant United States Attorney, on the brief), for Respondents-Appellees.
 Before: KEARSE, JACOBS, and STRAUB, Circuit Judges.
 STRAUB, Circuit Judge.
 
 
 1
 Petitioner-appellant Arturo Rafael Guaylupo-Moya brought a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 challenging a final administrative order of removal by the Board of Immigration Appeals ("BIA"), and he now appeals from the judgment of the United States District Court for the Southern District of New York (Naomi Reice Buchwald, Judge) denying his petition in an unpublished memorandum and order. Guaylupo-Moya is a lawful permanent resident whose removal order was based on a February 3, 1997, conviction for attempted rape in the second degree in violation of New York state law. Before the District Court and on appeal, Guaylupo-Moya has argued that he is eligible for a discretionary waiver of deportation based on extreme family hardship under section 212(h) of the Immigration and Nationality Act of 1952 ("INA"), codified as amended at 8 U.S.C. § 1182(h).
 
 
 2
 It is uncontested that, under the law at the time of Guaylupo-Moya's conviction, he is ineligible for a section 212(h) waiver because of two provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104-208, Div. C., Title III, 110 Stat. 3009-546, enacted September 30, 1996: Section 348(a) of IIRIRA amended section 212(h) to preclude family hardship waivers for lawful permanent residents convicted of an "aggravated felony," and section 321(a) of IIRIRA simultaneously expanded the definition of "aggravated felony" in a way that encompasses Guaylupo-Moya's offense. Guaylupo-Moya, however, contends that these provisions should not apply to him because his crime was committed prior to IIRIRA's enactment. Under the law when the offense was committed, his conviction would not have been classified an aggravated felony, and section 212(h) relief would have been available.
 
 
 3
 In making this argument, Guaylupo-Moya relies primarily on Beharry v. Reno, 183 F.Supp.2d 584 (E.D.N.Y.2002) (Weinstein, J.), rev'd on jurisdictional grounds sub nom. Beharry v. Ashcroft, 329 F.3d 51 (2d Cir.2003), which held that it would violate United States treaty obligations and customary international law to apply IIRIRA's restrictions on section 212(h) relief to an alien whose disqualifying criminal conduct occurred prior to IIRIRA's enactment. To avoid the perceived violation of international law, Beharry[1] ruled that section 212(h) should be interpreted to allow waivers for otherwise-eligible aliens who "have been convicted of an `aggravated felony' as defined after they committed their crime, but which was not so categorized when they committed the crime." Beharry, 183 F.Supp.2d at 605. On appeal, we reversed Beharry for lack of subject matter jurisdiction due to a failure to exhaust administrative remedies. See Beharry v. Ashcroft, 329 F.3d at 62-63 (explaining that petitioner never sought relief under section 212(h) before the BIA). But we did not reach the merits of Beharry's international law rationale, see id. at 63, and we have not done so in any subsequent case.
 
 
 4
 The facts of Guaylupo-Moya's case fall squarely within the parameters of Beharry and require us to confront that decision directly. In doing so, we now find that the Beharry decision, while commendable for its efforts and concern for human interests, cannot support the remedy it attempted to provide. In its most doctrinally sound form, Beharry urges that where a statute is ambiguous, we should construe the statute to conform to the principles of international law. Congress, however, plainly provided that IIRIRA's restriction on 212(h) relief and expanded definition of an aggravated felony should apply retroactively. Because Congress's intent is clear, it displaces any inconsistent norms of customary international law or prior treaty obligations. For this reason, we need not reach a number of controversial issues underlying the Beharry decision, including: whether the international law sources cited by Beharry actually rise to the level of customary international law; the extent to which international law, in general, can influence the construction and application of even ambiguous statutes; and whether domestic law actually is in conflict with the cited principles of international law. Our holding is thus a limited one: Even if we were to accept several controversial premises in the Beharry decision as true, the result in this case is controlled by Congress's plainly stated intent that IIRIRA's restrictions on section 212(h) relief apply retroactively.
 
 
 5
 We thus find that Guaylupo-Moya is not eligible for section 212(h) relief, and we further find Guaylupo-Moya's additional argument — that it is an impermissible ex post facto application of the law to classify him as an aggravated felon — to be unavailing. The judgment of the District Court is thus affirmed.
 
 I. BACKGROUND
 A. Statutory Context
 
 6
 The benchmark for modern immigration law is the Immigration and Nationality Act of 1952, Pub.L. No. 82-414, 66 Stat. 163, codified as amended at 8 U.S.C. § 1101 et seq. In pertinent part, section 212(a) of the INA, codified as amended at 8 U.S.C. § 1182(a), lists grounds rendering an alien inadmissible to the United States, including prior criminal activity.[2] Section 212(h) of the INA provides that the "Attorney General may, in his discretion, waive the application" of certain crime-related grounds for inadmissibility
 
 
 7
 in the case of an immigrant who is the spouse, parent, son, or daughter of a citizen of the United States or an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the alien's denial of admission would result in extreme hardship to the United States citizen or lawfully resident spouse, parent, son, or daughter of such alien . . . .
 
 
 8
 8 U.S.C. § 1182(h)(1)(B) (2000). Section 212(h) thus allows both lawful permanent residents and unlawful aliens to obtain discretionary waivers from exclusion or deportation based on such extreme family hardship.[3]
 
 
 9
 Prior to IIRIRA, such waivers were available where the exclusion or deportation was based on any of a broad range of criminal acts, but with IIRIRA's enactment on September 30, 1996, Congress substantially limited the availability of section 212(h) relief by providing: No waiver shall be granted under this subsection in the case of an alien who has previously been admitted to the United States as an alien lawfully admitted for permanent residence if either since the date of such admission the alien has been convicted of an aggravated felony or the alien has not lawfully resided continuously in the United States for a period of not less than 7 years immediately preceding the date of initiation of proceedings to remove the alien from the United States.
 
 
 10
 IIRIRA § 348(a), 110 Stat. at 3009-639 (amending 8 U.S.C. § 1182(h)).[4] Section 348(a) of IIRIRA, as interpreted by the BIA and as applied by the Immigration and Naturalization Service ("INS"),[5] thus precludes lawful permanent residents who commit aggravated felonies from obtaining section 212(h) relief, even though unlawful aliens who commit the same offenses are still eligible for such relief. See Jankowski-Burczyk v. INS, 291 F.3d 172 (2d Cir.2002) (upholding section 348(a) of IIRIRA against a challenge under the Equal Protection Clause).
 
 
 11
 IIRIRA heightened the impact of section 212(h)'s new aggravated felony limitation by simultaneously broadening the INA's definition of "aggravated felony." See IIRIRA § 321(a), 110 Stat. 3009-627 (amending 8 U.S.C. § 1101(a)(43)). The term "aggravated felony" had been introduced in 1988 as section 101(a)(43) of the INA and was initially defined to include only murder, drug trafficking, and illicit trafficking in a firearm or destructive device (as well as any attempt or conspiracy to commit such crimes). See Anti-Drug Abuse Act of 1988, Pub.L. No. 100-690 Title VII, Subtitle J, § 7342, 102 Stat. 4181, 4469-70 (codified at 8 U.S.C. § 1101(a)(43)). Congress had expanded the definition on multiple occasions thereafter,[6] but, prior to IIRIRA, several crimes-such as crimes of violence or theft offenses-only qualified as aggravated felonies if the sentence imposed involved at least five years' imprisonment. See, e.g., 8 U.S.C. § 1101(a)(43)(F), (G) (1994). IIRIRA, however, provided that those crimes would constitute aggravated felonies if they resulted in imprisonment of as little as one year or more. See IIRIRA § 321(a)(3), (4), 110 Stat. at 3009-627 (amending 8 U.S.C. § 1101(a)(43)(F), (G)). IIRIRA also defined aggravated felonies to include "rape[] or sexual abuse of a minor" regardless of the term of imprisonment imposed. See IIRIRA § 321(a)(1), 110 Stat. at 3009-627 (amending 8 U.S.C. § 1101(a)(43)(A)).
 
 B. Facts and Procedural History[7]
 
 12
 Guaylupo-Moya was born on March 29, 1931 and is a native and citizen of Ecuador. He was admitted to the United States on January 7, 1970, as a lawful permanent resident and has lived in the United States since that time. He is married to a United States citizen and has children who are also United States citizens. On December 24, 1996, Guaylupo-Moya pleaded guilty to one count of attempted rape in the second degree in violation of New York Penal Law § 130.30(1), which makes it illegal to engage in sexual intercourse with a person less than fifteen years old when one is eighteen years old or more. The charge arose out of acts occurring between September 1, 1996, and September 30, 1996. On February 3, 1997, he was sentenced to a term of five years' probation and his conviction was entered.
 
 
 13
 The INS served Guaylupo-Moya with a Notice to Appear on August 18, 1999, alleging that he is removable from the United States pursuant to INA section 237(a)(2)(A)(iii), codified at 8 U.S.C. § 1227(a)(2)(A)(iii), as an alien convicted of an aggravated felony. The "aggravated felony" designation is based on 8 U.S.C. § 1101(a)(43)(A), as amended by section 321(a)(1) of IIRIRA, which expanded the definition of an aggravated felony to include "rape[] or sexual abuse of a minor." See IIRIRA § 321(a)(1), 110 Stat. at 3009-627 (amending 8 U.S.C. § 1101(a)(43)(A)); see also 8 U.S.C. § 1101(a)(43)(U) (defining "aggravated felony" to include an attempt to commit any offense described in subsection (a)(43)). Prior to IIRIRA and at the time of the commission of the offense, the attempted rape likely would have been deemed a "crime of violence" but would have qualified as an aggravated felony only if it resulted in five years' imprisonment or more. See 8 U.S.C. § 1101(a)(43)(F) (1994). Because Guaylupo-Moya was sentenced to five years' probation, he would not have been deemed an aggravated felon under the law prior to IIRIRA.
 
 
 14
 In opposing his deportation, Guaylupo-Moya argued that he is eligible for a waiver of inadmissibility and deportation under sections 212(c) and 212(h).[8] The IJ rejected these claims and ordered that Guaylupo-Moya be removed. The BIA affirmed the IJ's decision without opinion on September 10, 2001. On June 3, 2002, Guaylupo-Moya filed his habeas petition with the District Court, arguing that he is eligible for relief under section 212(c) as it existed prior to AEDPA and under 212(h) as construed by the United States District Court for the Eastern District of New York in Beharry v. Reno, 183 F.Supp.2d 584 (E.D.N.Y.2002).
 
 
 15
 The District Court stayed the petition while the Beharry decision was being appealed. After Beharry was vacated for lack of jurisdiction, Guaylupo-Moya filed a motion to reopen to exhaust his administrative remedies as to his request for pre-AEDPA section 212(c) relief and for section 212(h) relief under Beharry. On November 21, 2003, the BIA denied the motion to reopen, declining to follow Beharry as to the request under section 212(h). Guaylupo-Moya then amended his habeas petition to reflect the BIA's denial of the motion to reopen and its rejection of Beharry.
 
 
 16
 The District Court denied the amended petition for writ of habeas corpus. First, the District Court found Guaylupo-Moya ineligible for 212(c) relief because he pleaded guilty after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). See AEDPA § 440(d), 110 Stat. at 1277 (precluding aliens convicted of aggravated felonies from receiving section 212(c) relief where their convictions were entered on or after the effective date of AEDPA); INS v. St. Cyr, 533 U.S. 289, 326, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (holding that " § 212(c) relief remains available for aliens . . . whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect"). The District Court also found that Guaylupo-Moya is ineligible for 212(h) relief, as amended by section 348 of IIRIRA, which precludes such relief for permanent resident aliens convicted of an aggravated felony. The District Court found that Congress was perfectly clear in its intent to apply section 348 of IIRIRA retroactively. The court further explained that IIRIRA's expanded definition of an "aggravated felony" clearly applies retroactively and covers Guaylupo-Moya's offense even though it would not have been an aggravated felony under the law at the time of its commission.
 
 
 17
 Turning to the Beharry argument, the District Court recognized that Guaylupo-Moya fits into the "narrow class of individuals subject to deportation for an act that was not deemed an aggravated felony at the time of commission." The court wrote, however, that "with all respect we disagree with the international law rationale advanced in Beharry," and it concluded that based on "the clear intent of Congress in its amendment of § 212(h), petitioner, as an aggravated felon, is not entitled to a `compassionate hearing.'"
 
 II. DISCUSSION
 
 18
 Guaylupo-Moya timely appealed from the judgment denying his habeas petition, but, on appeal, he only contends that he is eligible for relief under section 212(h) of the INA and does not contend that he is eligible for relief under section 212(c). In reviewing a district court's decision to deny a petition for writ of habeas corpus, we review the court's legal conclusions de novo and review factual findings supporting the decision for clear error. See Marrero Pichardo v. Ashcroft, 374 F.3d 46, 50 (2d Cir.2004). In this case, there is no dispute as to any factual finding.
 
 
 19
 Instead, the issues raised in this appeal solely concern whether the relevant provisions of IIRIRA may be applied to restrict relief under section 212(h) in the case of an alien, like Guaylupo-Moya, who was convicted of an offense after IIRIRA's enactment but whose crime was committed prior to IIRIRA's passage. Our decision today marks an addition to the line of cases in this Circuit on the retroactive effect of certain provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104-132, Title IV, 110 Stat. 1214, enacted April 24, 1996, and IIRIRA, enacted September 30, 1996 (collectively, "the 1996 Acts"). This case, however, raises unique issues in two respects. First, prior decisions in this Circuit have focused primarily on the 1996 Acts' effect on section 212(c) of the INA; we have not addressed the retroactivity issue with respect to section 212(h). Second, this appeal requires us to confront directly the argument presented in Beharry v. Reno that IIRIRA's retroactive application to aliens seeking section 212(h) relief should be limited to avoid an alleged conflict with international law.
 
 
 20
 Ultimately, our decision today is controlled by Congress's unambiguous intent that the relevant amendments to the INA enacted by IIRIRA shall apply retroactively. This intent is the dispositive factor both for our traditional analysis employed in the section 212(c) context and for our determination that Beharry, with its international law rationale, cannot support relief for Guaylupo-Moya.
 
 
 21
 A. Analyzing the Retroactivity Issue Under Second Circuit Precedent
 
 
 22
 In this Circuit, we have yet to address the retroactivity of IIRIRA's restrictions on relief under section 212(h), but we have developed a significant line of case law with respect to AEDPA's and IIRIRA's retroactive application to INA section 212(c) — a since-repealed provision that, similar to section 212(h), allowed for discretionary relief from exclusion or deportation.[9] Beginning with St. Cyr v. INS ("St. Cyr I"), 229 F.3d 406 (2d Cir.2000), aff'd, INS v. St. Cyr ("St. Cyr II"), 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), we have primarily addressed these retroactivity issues using the two-part framework provided by Landgraf v. USI Film Products, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Landgraf provides a mechanism for implementing the "deeply rooted" presumption that legislation should not have a retroactive effect unless Congress speaks plainly to the contrary. See St. Cyr I, 229 F.3d at 412 (quoting Landgraf, 511 U.S. at 265, 114 S.Ct. 1483). Under this framework, a court must first determine whether Congress "has expressly prescribed the statute's proper reach" — i.e., whether Congress clearly intended a retroactive application. See id. at 413 (quoting Landgraf, 511 U.S. at 280, 114 S.Ct. 1522). If Congress has spoken clearly, "the inquiry is over and the court must implement Congress's intent" unless doing so would be unconstitutional. Restrepo v. McElroy, 369 F.3d 627, 631 (2d Cir.2004). But if Congress's intent is ambiguous, a court proceeds to the second step: determining whether applying a statute to prior conduct would have a "retroactive effect" — i.e., whether it would change the legal consequences of past events. See St. Cyr I, 229 F.3d at 413 (citing Landgraf, 511 U.S. at 280, 114 S.Ct. 1483). Such an effect triggers the presumption against retroactivity, requiring a court to construe the statute to avoid upsetting settled expectations and producing unfair results. See id. at 412-13.
 
 
 23
 In St. Cyr I, we applied this framework to find that section 440 of AEDPA — which restricted the availability of section 212(c) relief for aggravated felons — and section 304 of IIRIRA — which eliminated section 212(c) relief altogether — could not apply to aliens who pleaded guilty prior to the enactment of the 1996 Acts. We found, first, that Congress did not unambiguously provide for the relevant provisions' retroactive application. See St. Cyr I, 229 F.3d at 413-16. In particular, with respect to IIRIRA's repeal of section 212(c), we noted that the provision governing the temporal reach of the repeal simply provided for an effective date, and we found that provision insufficiently clear for the purposes of the first Landgraf step. See id. at 414 (discussing impact of effective date provided in section 309(a) of IIRIRA); see also St. Cyr II, 533 U.S. at 317, 121 S.Ct. 2271 (declaring that "the mere promulgation of an effective date for a statute does not provide sufficient assurance that Congress specifically considered the potential unfairness that retroactive application would produce"). Proceeding to the second step of the Landgraf analysis, we found that, prior to the 1996 Acts, aliens often pleaded guilty to crimes in reliance on the possibility of obtaining a waiver of deportation under section 212(c). See St. Cyr I, 229 F.3d at 417-21. Thus we found that eliminating section 212(c) relief for such aliens changed the legal consequences of relevant prior conduct — the guilty plea — and that disturbing those aliens' settled expectations triggered the Landgraf presumption against retroactivity. See id. at 419-20. In affirming our decision, the Supreme Court similarly focused on the act of pleading guilty in reliance on section 212(c) as the key conduct triggering the fairness concerns underlying Landgraf. See St. Cyr II, 533 U.S. at 320-26, 121 S.Ct. 2271.
 
 
 24
 Following St. Cyr I, we held in Domond v. INS, 244 F.3d 81 (2d Cir.2001), that AEDPA's restriction on section 212(c) relief can apply to criminal conduct pre-dating the statutes where the conviction occurred after the relevant statutory enactment. We explained that such an application of AEDPA or IIRIRA had no "retroactive effect" because it did not change the legal consequences of criminal conduct; it is the conviction, not the underlying criminal act, that bars relief under section 212(c). See id. at 85-86. Citing dicta in St. Cyr I, we further found that, in contrast to aliens who may have pleaded guilty in reliance on section 212(c), "it cannot reasonably be argued that aliens committed crimes in reliance on a hearing that might possibly waive their deportation." Id. at 86 (citing St. Cyr I, 229 F.3d at 418-19). Domond was decided before the Supreme Court's decision in St. Cyr II, but we have reaffirmed that Domond is controlling and that the mere fact that criminal conduct pre-dates AEDPA or IIRIRA does not trigger any retroactivity concerns under the second Landgraf step. See Khan v. Ashcroft, 352 F.3d 521, 523-24 (2d Cir.2003); see also Restrepo, 369 F.3d at 632. In other cases, we have further held that aliens choosing to go to trial prior to the 1996 Acts, as opposed to those pleading guilty, were not detrimentally relying on the availability of 212(c) relief and thus cannot succeed under a Landgraf analysis. See Rankine v. Reno, 319 F.3d 93, 99-102 (2d Cir.2003), cert. denied sub nom. Lawrence v. Ashcroft, 540 U.S. 910, 124 S.Ct. 287, 157 L.Ed.2d 199 (2003); see also Thom v. Ashcroft, 369 F.3d 158, 161-63 (2d Cir.2004), petition for cert. filed, No. 04-9116 (U.S. Feb. 24, 2005).
 
 
 25
 Applying the Landgraf framework to Guaylupo-Moya's appeal, we first address whether Congress unambiguously prescribed the reach of section 348 and section 321 of IIRIRA, which combine to deprive Guaylupo-Moya of section 212(h) relief under the law as it is currently enforced. In addressing this question, we agree with the District Court that Congress unambiguously directed that these provisions shall apply retroactively.
 
 
 26
 Section 348(a) of IIRIRA eliminates section 212(h) relief for lawful permanent residents convicted of aggravated felonies, and section 348(b) expressly provides that the restriction in section 348(a) "shall be effective on the date of the enactment of this Act [September 30, 1996] and shall apply in the case of any alien who is in exclusion or deportation proceedings as of such date unless a final administrative order in such proceedings has been entered as of such date." IIRIRA § 348(b), 110 Stat. at 3009-639. Unlike the provisions at issue in St. Cyr I & II, section 348(b) of IIRIRA not only promulgates an effective date; it also directs that section 212(h) relief should be restricted in the case of aliens already in exclusion or deportation proceedings in which no final administrative order has been entered. The obvious effect of the latter clause is to cover aliens whose relevant criminal conduct and convictions occurred prior to IIRIRA's enactment. Thus, we find that Congress clearly intended that an alien placed in deportation proceedings after IIRIRA's enactment is subject to the restrictions on section 212(h) regardless of when the underlying criminal activity occurred. Indeed, the Supreme Court in St. Cyr II cited section 348(b) of IIRIRA as an example of an unambiguous expression of retroactivity. See St. Cyr II, 533 U.S. at 319 & n. 43, 121 S.Ct. 2271.
 
 
 27
 Moreover, as the District Court observed, Congress was clear in providing that the expanded definition of an aggravated felony in section 321(a) of IIRIRA should apply retroactively. Section 321(b) of IIRIRA states that the amended definition of "aggravated felony" shall apply "regardless of whether the conviction was entered before, on, or after the date of enactment," September 30, 1996. See IIRIRA § 321(b), 110 Stat. at 3009-628 (amending INA section 101(a)(43), codified at 8 U.S.C. § 1101(a)(43)). In Kuhali v. Reno, 266 F.3d 93 (2d Cir.2001), we found that section 321(b) of IIRIRA clearly provides for a retroactive application, and thus we held, under the first Landgraf step, that the expanded definition of an "aggravated felony" applied to an alien placed in deportation proceedings based on a 1980 conviction. Id. at 110-11; see also St. Cyr II, 533 U.S. at 319 & n. 43, 121 S.Ct. 2271. Under the plain language of IIRIRA and Kuhali, we must conclude that Congress intended the amended definition of an aggravated felony to apply to aliens, like Guaylupo-Moya, who committed crimes prior to IIRIRA.
 
 
 28
 We thus find that Congress clearly intended section 321(a) and section 348(a) of IIRIRA to preclude aliens like Guaylupo-Moya from obtaining section 212(h) relief. Because of this finding, we do not proceed to the second Landgraf step, and Guaylupo-Moya may not rely on the presumption against retroactivity in seeking a favorable construction of the statute.
 
 
 29
 In addition, to the extent that Guaylupo-Moya contends that it would violate the Ex Post Facto Clause of the Constitution to apply the expanded definition of an aggravated felony to him, this argument is unavailing. In both Domond and Kuhali, we declared that there can be no constitutional violation in applying AEDPA or IIRIRA to criminal conduct pre-dating the statutes because the Ex Post Facto Clause only applies to penal legislation and deportation proceedings have consistently been characterized as civil in nature. See Kuhali, 266 F.3d at 111-12 ("A long and constant line of precedent establishes that statutes retroactively setting criteria for deportation do not violate the ex post facto clause."); Domond, 244 F.3d at 87.[10]
 
 
 30
 B. Guaylupo-Moya's Argument Based on Beharry and International Law
 
 
 31
 Having rejected Guaylupo-Moya's argument under the traditional Landgraf framework, we now turn to his reliance on Beharry. Similar to the facts in this appeal, Beharry involved a permanent lawful resident who was convicted, upon a plea of guilty, in November 1996 (after IIRIRA's enactment) for a theft committed in July 1996 (prior to IIRIRA), and whose conviction resulted in less than five years' imprisonment. See Beharry v. Reno, 183 F.Supp.2d 584, 586-87 (E.D.N.Y.2002), rev'd on jurisdictional grounds sub nom. Beharry v. Ashcroft, 329 F.3d 51 (2d Cir.2003). Under section 212(h) as amended by IIRIRA, Beharry was ineligible for discretionary relief because he was classified as an "aggravated felon," but, under the law when the crime was committed, Beharry's offense would not have been classified an aggravated felony. On a petition for writ of habeas corpus, Beharry sought various forms of relief, including the right to a hearing under section 212(c). While the Beharry court found the requested relief unavailable, it found that Beharry was entitled to a hearing for "compassionate relief" under section 212(h), read in light of international law, because Beharry would not have been deemed an aggravated felon under the law when the offense was committed. Beharry, 183 F.Supp.2d at 603, 604-05.
 
 
 32
 The District Court reviewing Guaylupo-Moya's petition correctly observed that the facts of the case fall squarely within the holding in Beharry. In addressing Guaylupo-Moya's argument under Beharry, we first examine the Beharry opinion itself before explaining why we now hold that the reasoning of the decision cannot support the relief it attempted to provide.
 
 
 1. The Beharry Decision
 
 
 33
 The international law argument in Beharry is premised largely on the "Charming Betsy principle" that statutes, whenever possible, should be construed to conform with international law. See Beharry, 183 F.Supp.2d at 598-99 (citing Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) (Marshall, C.J.)) ("[A]n act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains. . . ."). This argument arose in the context of our 2001 decisions in Domond and Kuhali, which precluded a claim that applying IIRIRA would be impermissibly retroactive under the second Landgraf step and also precluded any contention that a retrospective application of IIRIRA would risk violating due process or the Ex Post Facto Clause. The Beharry court noted, however, that neither "Kuhali nor Domond ruled on the international law questions presented in the instant case," see id. at 589, and it declared that "[v]iewed from the perspective of the international law reviewed in this memorandum beginning with Charming Betsy, the rationales of Domond and Kuhali fail to account for the full necessary interpretive statutory background," see id. at 591. The Beharry court thus presented the argument that an application of IIRIRA in Beharry's case would violate international law and that, notwithstanding Second Circuit precedent, section 212(h) should be construed to avoid such a violation.
 
 
 34
 In laying out the applicable international law, Beharry reviewed the International Covenant on Civil and Political Rights ("ICCPR"), Dec. 19, 1966, 999 U.N.T.S. 171, the United Nations Universal Declaration of Human Rights ("UDHR"), G.A. Res. 217(III)A, U.N. Doc. A/810 (1948), and the Convention on the Rights of the Child ("CRC"), Nov. 20, 1989, 1577 U.N.T.S. 3, reprinted in 28 I.L.M. 1448, 1456. Beharry explained that those international law sources provide, for example, that an alien lawfully residing in a territory "`be allowed to submit the reasons against his expulsion'" and that "`[n]o one shall be subjected to arbitrary or unlawful interference with his . . . family.'" See id. at 595 (ellipsis in original) (quoting ICCPR arts. 13, 17); see also id. (noting that UDHR art. 9 prohibits the imposition of "`arbitrary . . . exile'"); id. at 596 (citing provisions of CRC that provide, in essence, that the best interests of the child — including the right to be cared for by parents — should be a primary consideration and should be protected). Beharry declared that separating an alien from his family without allowing him to submit family hardship reasons against deportation would violate various provisions of the cited documents. See id. at 595-96.
 
 
 35
 As Beharry noted, however, none of the above sources of international law have the effect of domestic law. The ICCPR is a signed and ratified treaty, but it came with attached Reservations, Understandings, and Declarations ("RUDs") declaring that it is not self-executing. See id. at 595; see also 138 Cong. Rec. 8068, 8071 (1992); S. Exec. Rep. No. 102-23, 102d Cong., 2d Sess. (1992) (Declarations ¶ 1), reprinted in 31 I.L.M. 645, 659 (1992). Self-executing treaties generally have the force of domestic law and can be directly enforced by courts. See Beharry, 183 F.Supp.2d at 593; see also Cheung v. United States, 213 F.3d 82, 94-95 (2d Cir.2000). But when a treaty is not self-executing, the treaty does not provide independent, privately enforceable rights. See Beharry, 183 F.Supp.2d at 593; see also Flores v. S. Peru Copper Corp., 343 F.3d 140, 163 n. 35 (2d Cir.2003) (explaining that ICCPR does not create private, directly enforceable rights because the Senate declared that it is not self-executing). Beharry similarly acknowledged that the UDHR is not a treaty and that the CRC has been signed but never ratified by the United States. Beharry, 183 F.Supp.2d at 596.
 
 
 36
 Despite their not having the effect of domestic law, Beharry contended that the ICCPR, UDHR, and CRC could play a role in statutory construction. In particular, Beharry discussed the nature and impact of customary international law in light of the Charming Betsy principle that "courts should interpret legislation in harmony with international law and norms wherever possible." See id. at 598. The Beharry court acknowledged that "Congress may override provisions of customary international law." Id. at 599 (citing The Paquete Habana, 175 U.S. 677, 694, 20 S.Ct. 290, 44 L.Ed. 320 (1900)). But Beharry contended that "in order to overrule customary international law, Congress must enact domestic legislation which both postdates the development of a customary international law norm, and which clearly has the intent of repealing that norm." Beharry, 183 F.Supp.2d at 599; see also id. at 600 ("Where a statute appears to contradict international law, an appropriate remedy is to construe the statute so as to resolve the contradiction. Customary international law is legally enforceable unless superceded by a clear statement from Congress. Such a statement must be unequivocal. Mere silence is insufficient to meet this standard." (citation omitted)). The Beharry court further found that Congress "has not expressed a clear intent to overrule . . . customary international law" as expressed in the CRC, in particular. Id. at 604.
 
 
 37
 The Beharry court determined that, as interpreted and implemented against Beharry, IIRIRA would conflict with treaty-based (ICCPR-based) and customary (CRC-based) international law, and the court contended that such violations raised a potential constitutional issue: "Since both statutes and international law are enforceable under the Constitution's Supremacy Clause, the statute should be construed in conformity with international law to avoid a constitutional issue if fairly possible." Id. at 604 (internal quotation omitted). The Beharry court thus sought to "make the minimal changes necessary to bring the statute into compliance" with international law and crafted a "narrowly targeted" remedy of limiting IIRIRA's applicability to prior criminal conduct:
 
 
 38
 It would be a violation of international law to categorically deny to all [aliens otherwise eligible under section 212(h)] who have been denominated after their crime was committed as "aggravated felons," relief under the provision. The statutory provision "No waiver shall be provided . . . if . . . the alien has been convicted of an aggravated felony" should be narrowly construed so as to accord with international law. That can be done by ruling that section 212(h) waivers are available for aliens, including petitioner, who meet its stringent requirements of seven years residence and "extreme hardship" to family — if these aliens have been convicted of an "aggravated felony" as defined after they committed their crime, but which was not so categorized when they committed the crime.
 
 
 39
 Id. at 604-05. Beharry concluded by calling on this Court to reconsider Domond and Kuhali and to redefine "the operative time from which to define retroactivity under the statute [as] the moment the crime was committed, rather than the date of conviction." Id. at 605. Doing so, the Beharry court stated, "would obviously be a more comfortable rationale than one [such as in Beharry] depending upon international law ex proprio vigore." Id.
 
 
 40
 Before addressing the merits of Beharry, we note that Judge Weinstein in Beharry is not the only judge to express doubts about our decision in Domond,[11] and there is no question that the principles of international law cited in Beharry reflect high and noble aspirations for the United States and the nations of the world. But the precise role of international law in the Beharry analysis is not entirely clear. In one sense, Beharry can be read as offering a relatively modest — though not uncontroversial — principle of statutory construction: that a court should interpret statutes, when ambiguous, to conform to international law. Alternatively, some portions of Beharry can be read to expound a more radical view that treaties (even if non-self-executing) and emerging customary international law can override domestic law unless and until Congress expressly repudiates the international norms. While Beharry found that Congress did not express a specific intent to override principles of customary international law, it apparently assumed, without discussion, that Congress's intent was not clear on whether IIRIRA's restriction on section 212(h) relief applies to prior criminal conduct. As will be explained, the clarity of Congress's intent as to IIRIRA and section 212(h) is ultimately dispositive in this case.
 
 
 41
 Moreover, there are number of premises underlying the Beharry decision that are highly controversial. For example, it is not clear that the international law documents cited in Beharry rise to the level of customary international law. And courts' ability to look to international law when interpreting even ambiguous statutes is, of course, a hotly contested issue. Beyond those issues is the question of whether a retroactive application of IIRIRA actually conflicts with the provisions of the ICCPR and CRC at all. But, for the reasons explained below, we need not resolve these issues because Congress's intent is this case is clear. Even accepting, arguendo, that several of these controversial premises could be resolved favorably to the Beharry rationale, it is Congress's clear intent that controls in this case.[12]
 
 
 2. Disposition of the Beharry Issue
 
 
 42
 In its most doctrinally sound form, Beharry can be read as applying the Charming Betsy principle that, where legislation is ambiguous, it should be interpreted to conform to international law. Indeed, we recently recognized the Charming Betsy principle in United States v. Yousef, 327 F.3d 56 (2d Cir.) (per curiam), cert. denied, 540 U.S. 933, 124 S.Ct. 353, 157 L.Ed.2d 241 (2003), where we stated: "While it is permissible for United States law to conflict with customary international law, where legislation is susceptible to multiple interpretations, the interpretation that does not conflict with `the law of nations' is preferred." Id. at 92 (citing Charming Betsy, 6 U.S. (2 Cranch) at 118). As we explained in Yousef, however, the "Charming Betsy canon comes into play only where Congress's intent is ambiguous." Id. "If a statute makes plain Congress's intent . . . then Article III courts, which can overrule Congressional enactments only when such enactments conflict with the Constitution, must enforce the intent of Congress irrespective of whether the statute conforms to customary international law." Id. at 93 (citation omitted); see also Comm. of U.S. Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 938-39 (D.C.Cir.1988) (explaining that statutes supercede inconsistent customary international law); United States v. Pinto-Mejia, 720 F.2d 248, 259 (2d Cir.1984) ("[I]n enacting statutes, Congress is not bound by international law. . . . As long as Congress has expressly indicated its intent to reach [certain conduct], a United States court would be bound to follow the Congressional direction unless this would violate the [Constitution]." (internal quotations omitted)).
 
 
 43
 As discussed above, Congress's intent in this case is clear: Section 348 of IIRIRA (which restricts section 212(h) relief for aggravated felons) and section 321 of IIRIRA (which expands the definition of "aggravated felony") apply to criminal acts and convictions occurring prior to IIRIRA's enactment. Thus, in this case, Congress's intent is controlling, even if we assume the existence of the customary international law on which Beharry relies and assume that the application of IIRIRA would be in conflict with those customary norms. Similarly, even if the ICCPR had created treaty obligations that, as Beharry claims, would be violated by applying IIRIRA to aliens such as Beharry or Guaylupo-Moya, clear congressional action supercedes prior treaty obligations to the extent they are inconsistent. See Empresa Cubana Del Tabaco v. Culbro Corp., 399 F.3d 462, 481 (2d Cir.2005) ("`[L]egislative acts trump treaty-made international law' when those acts are passed subsequent to ratification of the treaty and clearly contradict treaty obligations." (quoting Yousef, 327 F.3d at 110)); Bradvica v. INS, 128 F.3d 1009, 1014 n. 5 (7th Cir.1997) ("[C]ustomary international law is not applicable in domestic courts where there is a controlling legislative act . . . . And a prior treaty does not trump the provisions of a subsequent legislative act."); Comm. of U.S. Citizens Living in Nicaragua, 859 F.2d at 936 ("[T]reaties and statutes enjoy equal status and therefore . . . inconsistencies between the two must be resolved in favor of the lex posterior."). Even if IIRIRA's restriction on section 212(h) relief were inconsistent with the ICCPR, IIRIRA's enactment in 1996 post-dates the ICCPR, and thus IIRIRA would be controlling.[13]
 
 
 44
 Because Congress's intent in this case is clear and controlling, we need not decide whether and/or how, in other contexts, international law may be used to construe ambiguous statutes; nor do we need to decide whether an application of IIRIRA in this context actually violates international law, as argued in Beharry. For the purposes of this decision, we need only observe that Beharry was incorrect in the following respects. First, to the extent that Beharry purports to interpret an ambiguous statute to avoid a conflict with international law, it failed to determine whether the relevant provisions of IIRIRA were indeed ambiguous as to their application to prior conduct. Because the relevant provisions are unambiguous, Beharry improperly sought to apply the Charming Betsy canon. Second, to the extent that Beharry purports to declare that international law should override the plain language and effect of the relevant statutes, that reasoning was in error, clear congressional action trumps customary international law and previously enacted treaties.
 
 
 45
 Moreover, to the extent that Guaylupo-Moya argues that United States treaty obligations independently entitle him to a "compassionate hearing" — as opposed to influencing our construction of section 212(h) — that argument is without merit. (Indeed, not even Beharry stands for such a proposition.) The only ratified treaty cited in Beharry and by Guaylupo-Moya, the ICCPR, came with attached RUDs declaring that the ICCPR is not self-executing. This declaration means that the provisions of the ICCPR do not create a private right of action or separate form of relief enforceable in United States courts. See Flores v. S. Peru Copper Corp., 343 F.3d 140, 163 n. 35 (2d Cir.2003) (explaining that the ICCPR does not create a private right of action because the Senate declared that it is not self-executing); Igartua De La Rosa v. United States, 32 F.3d 8, 10 n. 1 (1st Cir.1994) (per curiam) (same), cert. denied, 514 U.S. 1049, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995).
 
 CONCLUSION
 
 46
 For the foregoing reasons, we affirm the District Court's judgment denying the petition for writ of habeas corpus.
 
 
 
 Notes:
 
 
 *
 Pursuant to Fed. R.App. P. 43(c)(2), Attorney General Alberto R. Gonzales is automatically substituted for former Attorney General John Ashcroft as a respondent in this case
 
 
 [1]
 References in this opinion to "Beharry" are to the district court decision.
 
 
 [2]
 Prior to IIRIRA, section 212(a) used terminology referring to the "exclusion" of aliens; IIRIRA, in section 212(a) and elsewhere, replaced the term "is excludable" (and related derivations) with the term "is inadmissible" (and similar derivations)See IIRIRA § 308(d), 110 Stat. at 3009-616 to -617.
 
 
 [3]
 Section 212(h) purports to provide a waiver of inadmissibility (excludability) only, but, "by a quirk elsewhere in the INA," it effectively allows for a waiver of deportation as wellJankowski-Burczyk v. INS, 291 F.3d 172, 175 (2d Cir.2002); see also id. at 175 n. 2 (explaining why the "quirk" exists); infra note 8 (explaining how "quirk" operates in Guaylupo-Moya's case). The distinction between deportation and denial of admission may be relevant in some contexts, see Drax v. Reno, 338 F.3d 98, 107-08 & n. 13 (2d Cir.2003), but is irrelevant to this appeal. This opinion generally refers to exclusion, denial of admission, and deportation interchangeably.
 
 
 [4]
 Prior to IIRIRA, waivers were also prohibited "in the case of an alien who has been convicted of (or who has admitted committing acts that constitute) murder or criminal acts involving torture, or an attempt or conspiracy to commit murder or a criminal act involving torture." 8 U.S.C. § 1182(h) (Supp. I 1995), as amended by Immigration Act of 1990 ("IMMAct"), Pub.L. No. 101-649, § 601(d)(4), 104 Stat. 4978, 5076-77 (prohibiting waiver for murder or torture), and Immigration and Nationality Technical Corrections Act of 1994 ("INTCA"), Pub.L. No. 103-416, § 203(a)(3), 108 Stat. 4305, 4311 (extending preclusion to include attempt or conspiracy to commit murder and acts involving torture)
 
 
 [5]
 Pursuant to the Homeland Security Act of 2002, Pub.L. No. 107-296, § 441, 116 Stat. 2135 (codified at 6 U.S.C. § 203(3)), on March 1, 2003, the INS ceased to exist as an independent agency within the Department of Justice and its functions were transferred to the Department of Homeland Security. To be consistent with the District Court order, and because the rulings at issue in this case were made when the agency was still the INS, we refer to the relevant agency as the INS in this opinion
 
 
 [6]
 See IMMAct § 501(a)(3), 104 Stat. at 5048 (expanding definition to include, inter alia, crimes of violence resulting in at least five years' imprisonment); INTCA § 222(a), 108 Stat. at 4320 (expanding list of crimes and giving INA section 101(a)(43) its current structure); Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, Title IV, Subtitle D, § 440(e), 110 Stat. 1214, 1277-78 (expanding definition to include, inter alia, perjury and forgery of passports).
 
 
 [7]
 The relevant facts and procedural history are undisputed
 
 
 [8]
 Specifically, Guaylupo-Moya sought to avoid deportation by obtaining an adjustment of status pursuant to section 245 of the INA, codified at 8 U.S.C. § 1255. An adjustment of status is available only if, among other things, the alien is admissible to the United States for permanent residenceSee 8 U.S.C. § 1255(a). Under section 212(a) of the INA, however, aliens who have committed crimes of moral turpitude are inadmissible, and the parties do not dispute that Guaylupo-Moya's crime of attempted rape in second degree is considered a crime of moral turpitude. Thus, Guaylupo-Moya needs to obtain a waiver of inadmissibility under section 212(c) or section 212(h) in order to obtain an adjustment of status and avoid deportation.
 
 
 [9]
 Section 212(c) of the INA, codified at 8 U.S.C. § 1182(c), enabled aliens who were lawfully admitted for permanent residence and who resided in the United States for seven consecutive years to obtain a waiver of inadmissibility or deportation at the discretion of the Attorney General based on various equitable groundsSee Matter of Marin, 16 I. & N. Dec. 581, 584-85 (BIA 1978) (describing the role of section 212(c) and listing factors to be considered in request for relief under the provision). AEDPA substantially restricted the availability of section 212(c) by precluding relief for aliens convicted of, among other things, an aggravated felony or controlled substance offense. See AEDPA § 440(d), 110 Stat. at 1277. IIRIRA then repealed section 212(c) altogether, IIRIRA § 304(b), 110 Stat. at 3009-597, and replaced it with a new provision that allows the Attorney General to cancel the removal of a narrowly defined group of aliens not including those who had committed an aggravated felony, IIRIRA § 304(a), 110 Stat. at 3009-594 (enacting section 240A of the INA, codified at 8 U.S.C. § 1229b).
 
 
 [10]
 The government argues that Guaylupo-Moya failed to raise anyex post facto argument before the IJ or BIA and that, with respect to this specific issue, he thus failed to exhaust his administrative remedies under 8 U.S.C. § 1252(d)(1). See Theodoropoulos v. INS, 358 F.3d 162, 169-72 (2d Cir.) (holding that 8 U.S.C. § 1252(d)(1) applies to habeas petitions and requires exhaustion), cert. denied, ___ U.S. ___, 125 S.Ct. 37, 160 L.Ed.2d 34 (2004). Because the exhaustion requirement raises a question of statutory, rather than constitutional, jurisdiction, we need not resolve the exhaustion issue in this case and can dispose of Guaylupo-Moya's argument on its merits. See Abimbola v. Ashcroft, 378 F.3d 173, 180 (2d Cir.2004) (declining to decide exhaustion issue and asserting "hypothetical jurisdiction" to dispose of petitioner's claim on the merits).
 
 
 [11]
 For example, inThom v. Ashcroft, Judge Calabresi commented that, "[s]peaking only for [him]self," if he were judging on a "clean slate," he would be inclined to extend the Landgraf presumption against retroactivity to applications in the deportation context that "would be considered ex post facto in the criminal context." 369 F.3d 158, 163 n. 6 (2d Cir.2004), petition for cert. filed, No. 04-9116 (U.S. Feb. 24, 2005); see also id. at 167-69, 168 n. 2 (Underhill, J., dissenting) (arguing that, under Landgraf, IIRIRA should not be applied to aliens convicted prior to its enactment, and, in a footnote, questioning a portion of the reasoning in Domond).
 
 
 [12]
 Congress's intent as to the retroactive effect of IIRIRA's amendment to section 212(h) is also crucial to the extent thatBeharry invokes the canon of avoiding constitutional issues (in this case, a Supremacy Clause conflict between domestic laws and treaties, see Beharry, 183 F.Supp.2d at 604). See Zadvydas v. Davis, 533 U.S. 678, 696, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (invoking canon of construing statutes to avoid serious constitutional questions, but noting that "if Congress has made its intent in the statute clear, we must give effect to that intent" (internal quotations omitted)).
 
 
 [13]
 The ICCPR entered into force in 1976, and the Senate ratified it with the attached RUDs in 1992